IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(NORTHERN DIVISION)

| | | |
|---|---|---|
| PATRICE WOLFE, | * | |
| Plaintiff, | * | |
| v. | * | Civil Court Action No: L02 CV-3965 |
| MED-TEL INTERNATIONAL CORPORATION, | * | |
| Defendant. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Patrice Wolfe is a former employee of Defendant Med-Tel International

Corporation (hereafter, "Med-Tel"). She has sued Med-Tel under Title VII of the Civil Rights

Act of 1964, 42 U.S.C. §2000e, *et seq.* (hereafter, "Title VII"), alleging that she was sexually

harassed (Count I) and that she was retaliated against for engaging in conduct prohibited by Title

VII (Count II). Plaintiff asserts that this retaliation consisted of denial of a promotion in early

2001, the termination of her employment in May 2002 and a continuing hostile environment.

Med-Tel has moved for summary judgment with respect to Wolfe's claims in this case.

This Memorandum is submitted in support of that Motion.

## I.  SUMMARY OF PLAINTIFFS' ALLEGATIONS

Wolfe states that she was employed by Med-Tel from 1997 until May 7, 2002. She

alleges she was sexually harassed by Michael. Barnes, who is alleged to have been her

supervisor, starting in late 1999. Complaint, ¶7. Wolfe further alleges that she complained of this harassment in August of 2000, that her allegations were investigated and that Barnes was forced to resign in September 2000. Complaint, ¶8.

Wolfe also alleges that she was approached by Ron Coleman, described as "the owner and Chief Executive" of Med-Tel, at a company function in December of 2000 and that he made sexual advances toward her. Complaint, ¶¶10, 11. Wolfe does not assert that she registered any internal complaint regarding these alleged actions.

Wolfe states that she applied for a Chief Technologist job shortly after the encounter with Coleman. Complaint, ¶12. She claims that, shortly after the December 2000 meeting, the position was given to a Mr. Parker, whom Wolfe asserts was less qualified and given special coaching for the interview process. *Id*.

Wolfe alleges generally that she was subjected to a hostile and offensive work environment throughout the balance of 2001, which she considered retaliation for "her refusal to submit to Mr. Coleman's sexual advances, her refusal to tolerate improper sexual statements and actions by other supervisors and her complaints about such matters." Complaint, ¶13. Wolfe's Complaint does not describe any specific actions that created the alleged hostile environment; nor does she identify any of the alleged perpetrators of any such actions.

Finally, Wolfe alleges that she was terminated in May 2002 after an incident with a new employee whom she had been assigned to mentor. Complaint, ¶¶ 14-15. She states that she was terminated by David Parker for "disruption of the workplace." Complaint, ¶16.

Med-Tel demonstrates below that Count I of the Complaint is barred by the applicable statute of limitations, that Wolfe's retaliation claim, as it relates to the denial of the promotion, is

likewise time-barred, and that the record contains no evidence that would permit a reasonable

fact-finder to conclude that any of Med-Tel's actions were motivated by retaliation or that any

continuing violation existed.

## II.  STATEMENT OF FACTS

### A.  BACKGROUND

Med-Tel is a telemedicine company that operates approximately 18 outpatient radiology

clinics, primarily MRI facilities operating under the trade name "Wide Open MRI," in smaller

communities in the United States and in the United Kingdom.  Coleman 5-7;  Klein 7-8[1].  The

images captured at the local facilities are digitized and read by physicians at central locations.

Coleman 6.  Med-Tel is headquartered in McLean, Virginia. Coleman 7;  Klein 7.

Wolfe was hired by Med-Tel to work as an MRI technologist at Med-Tel's Toledo, Ohio

facility in 1997. Klein 10.  She was supervised by Michael ("Mike") Greene, who supervised all

of the MRI Technologists at that time.  Wolfe 85;  Coleman 22-23;  Klein 11-14.  Wolfe moved

to Med-Tel's Salisbury, Maryland facility in late 1999 or January of 2000 (Wolfe 85;  Klein 10-

13), for reasons that are disputed.  In Med-Tel's view, this move occurred because Wolfe became

involved in an extra-marital affair and was entertaining her suitor (Carlos Marroquin) at the

Med-Tel facility, which ultimately led to a disruption in the workplace.  Coleman 33-34;  Klein

49-50.  Med-Tel had a serious need for MRI technologists at its Salisbury facility, recognized

---

[1]        References to deposition testimony taken in this case are made by citing the deponent's
name and the relevant page numbers.  The pages cited, as well as the exhibits referenced herein,
are provided to the Court through an Appendix filed as a lengthy exhibit.

that Wolfe's skills as an MRI technologist were good and hoped that the distance from Toledo

would put an end to the affair and give Wolfe a new start.  Klein 49-50.  Wolfe agreed that she

was carrying on an affair with Marroquin (Wolfe 30-32), but omitted any mention of the

relationship or the disruption at the office in connection with the transfer to Salisbury.

Complaint ¶6.

**B.    THE BARNES HARASSMENT COMPLAINT**

Wolfe claimed that when she came to the Salisbury site in January of 2000, "there was a

lot of sexual harassment going on by Mike Barnes…".[2]  Wolfe 85.  The Med-Tel Employee

Handbook in effect during this period contained an extensive anti-harassment policy that clearly

defined the conduct Wolfe described as sexual harassment, contained a reporting procedure for

this harassment, and advised employees, if the complaint was not promptly resolved by the

supervisor to whom it was reported, that they should "go directly to the General Counsel of the

Company for resolution of the problem."  Exhibit 2; see Exhibit 1 ¶3.

Wolfe testified that she did not look to the Handbook to see what she should do with

respect to the harassment;  she decided to "just ignore it" because of her personal belief that "it

was an all boys club."   Wolfe 90.  Wolfe states that she complained of the harassment to Greene

during her evaluation in August of 2000.  Wolfe 93.

Wolfe claims that shortly thereafter she had a conversation with Safety Coordinator Chris

Sullivan, who told her that she needed "to report the problem to human resources."  Id. at 89, 93-

95.  Wolfe did not report the situation to Human Resources.  Id. at 93.  Sullivan did report it, and

---

[2]    At this point, Barnes was a Regional Chief Technologist.  See, Parker 33, Klein 39.  As a
Regional Chief Technologist, Barnes reported to Greene, who in turn reported to the Chief
Medical Officer (Dr. Platenberg).  Klein 40;  Parker 58-59.

later that same day, Rebecca Naser, Med-Tel's Vice President for Human Resources,[3] contacted Wolfe to tell her that Med-Tel had a zero tolerance for harassment and that Naser would be coming to the Salisbury facility to speak with her.  Wolfe 95-97;  Klein 17.  Naser and Robert ("Bob") Klein, Med Tel's Executive Vice President for Law,[4] traveled to the Salisbury facility to same day to commence the investigation.  Wolfe 97;  Klein 17-19.

Naser interviewed Wolfe.  Wolfe 98; Klein 18-19.  Wolfe described Barnes' behavior to Naser.[5]  Wolfe 98.  As part of the investigation process, Naser prepared a memorandum summarizing her interview with Wolfe.  Exhibit 4.  Wolfe reviewed, corrected and signed the memorandum.  Wolfe 230-32.

After the interviews, Med-Tel decided to terminate Barnes.  Klein 19.  Med-Tel summoned Barnes to its McLean headquarters for a meeting with Naser, Klein and Jim McGillan, Med-Tel's Vice Chairman and General Counsel.  Klein 19, 26.  They informed Barnes

---

[3]     See Exhibit 11 at ¶3.

[4]     Klein at 5.

[5]     Wolfe currently claims that she also described harassing behavior by Greene.  Wolfe claimed that she experienced harassment from Greene in that he had "nude men" and "semi-pornographic jokes" on his laptop computer and would share them with employees.  Wolfe 86. Wolfe claims that Greene didn't talk to her after Barnes resigned in lieu of termination in October of 2000, and that she did not see any further pornographic jokes on his computer thereafter.  Wolfe 88.   Wolfe stated that, although Mike Greene was also her supervisor when she worked in the Toledo facility,  he did not engage in any sexual harassment during that period.  Wolfe 85-86.  The summary of Wolfe's interview with Naser (see *infra*) contains no mention of any harassment by Greene.

that the decision had been made to terminate him and that he "had two choices, you can either resign or you can be fired." Klein 19.  Barnes decided to resign.  *Id*.

## C.   THE REGIONAL CHIEF TECHNOLOGIST PROMOTION

A month or two after Barnes' departure, Med-Tel informed employees that it was seeking candidates to fill the Regional Chief Technologist position he had held.  Wolfe 154-55;  Parker 37-38; Klein 40, 43-44.  There were two applicants – Wolfe and David Parker, who was then an MRI Technologist in Med-Tel's Dover, Delaware facility.  Wolfe 156-57; Parker 38-39; Klein 43-44.  Wolfe and Parker submitted written correspondence explaining why they felt they were qualified for the position.  Exhibits 6, 7.

A panel consisting of Craig Platenberg, M.D., Med-Tel's Executive Vice-President of Medical Operations, Lawrence Yao, M.D. a musculoskeletal radiologist employed by Med-Tel, and Charles Lott, Med-Tel's Vice President for Human Resources, interviewed the candidates for the Chief Regional Technologist position and made the selection decision.  Exhibit 1 ¶¶4-6; Coleman 26-27; Wolfe 168; Parker 40-42.  No other department was involved.  Klein 44-46.

The two candidates were asked questions to explore the same seven subject areas, which are set forth on the "Regional Chief Technologist Panel Questions/Ratings" sheets used at the interview sessions.  Exhibits 1 ¶5,  9A-F.  All three panel members rated Mr. Parker more highly than Ms. Wolfe.  Mr. Parker received higher ratings primarily in areas involving prior supervisory experience, his concept of a "team player" and his ideas regarding how he would transition to the supervisor role and the changes he thought would improve the imaging work done at the facilities the Regional Chief Technologist would supervise.  Exhibits 1 ¶6, 9A-F; see

Klein 46. These strengths, in the panel's opinion, made Mr. Parker more qualified for the Regional Chief Technologist position and he was selected on that basis. *Id.*

**D.     THE EVENTS LEADING TO WOLFE'S TERMINATION**

In the spring of 2002, several events occurred which led to Wolfe's termination. The first involved Wolfe's lengthy telephone conversations, while at Med-Tel, with her paramour in Ohio.

In 2002, Charles Lott conducted a quarterly meeting for supervisors and managers at Med-Tel's McLean Virginia headquarters. Exhibit 1 ¶7. At the quarterly meeting held on April 9, 2002, the subject of abuse of Med-Tel property, including excessive personal telephone calls, came up in a discussion at the end of the meeting. Exhibit 1 ¶8.

After that meeting, Lott requested and reviewed copies of the telephone bills Med-Tel received from carriers who provided service to Med-Tel facilities. In order to identify potential abusive patterns, he focused upon identifying lengthy calls, particularly lengthy calls to the same number. Exhibit 1 ¶9. His review, which covered bills for the one month period from mid-March to mid-April, 2002, revealed that some 10 lengthy calls, ranging from 31 to 62 minutes in length and totaling almost 7 hours, were made on Med-Tel's incoming 800 line from a number in Sylvania, Ohio to Med-Tel's Salisbury facility. Exhibit 1 ¶¶9-11; Exhibit 10 . Lott's e-mail notes that in addition there were "numerous 10 and 20(+) minute calls from the same … number." Exhibit 10. Lott's contemporaneous research into the calls demonstrated that the calls were being made by Patti Wolfe's paramour in Ohio.[6] Exhibit 1 ¶11; see Klein 51-53, 58.

---

[6]     Wolfe conceded that her long-distance relationship with Marroquin continued until the day before the day she was terminated by Med-Tel and that she had lengthy telephone conversations with him at work, during working hours. Wolfe 42-45.

Lott shared his research regarding the telephone calls with his direct supervisor, with Dr. Platenberg and with Mike Greene. Exhibit 1 ¶12. Greene and Rebecca Naser both professed familiarity with Ms. Wolfe's telephone abuse on prior occasions and indicated that she had been counseled previously regarding this behavior. Lott Affidavit ¶12; see Exhibit 11 ¶10; Klein 57-58, 73-73. Parker had some knowledge of this behavior, but was not aware of the extent of the problem. Parker 121-24.

During the period these events were occurring at Med-Tel's headquarters, problems were occurring at the Salisbury location. See Exhibit 1 ¶13. Parker had become aware of interpersonal issues between Wolfe and other Technologists[7]. Exhibit 1 ¶13; Parker 98, 105-07; Exhibit 12. The Technologists working with Wolfe at Salisbury at that time were Dwayne Molock, Christine Byrd, Robin Spahn and Amy Lenderking, a new Technologist whom Wolfe had been assigned to mentor. Wolfe 57, 181-82; Klein 84; Parker 57-58, 60.

The interaction between Wolfe and Lenderking was brought to the attention of Med-Tel's corporate office in May 2002. On Friday, May 3, Wolfe had an interaction with Lenderking that Lenderking perceived as offensive. Exhibit 17; Wolfe 192; Parker 87-90. Apparently, Lenderking remained upset about the incident, which led her to call Wolfe's home on the night of Saturday, May 4. Exhibits 13, 17, 18. Wolfe's son answered the phone. Exhibit 18. Lenderking apparently thought the better of continuing with the call and hung up before Wolfe picked up the telephone. Exhibits 13, 17, 18. Wolfe did not let the matter drop, but called Lenderking back. *Id.* When Lenderking hung up without answering, Wolfe called several more

---

[7]    Parker was responsible for Med-Tel locations in an area from Chambersburg, Pennsylvania south to Berlin, Maryland. Parker 50-51. He spent limited time at the Salisbury facility. Parker 43-44.

times, until Lenderking finally answered. *Id*. Lenderking expressed her displeasure with Wolfe's conduct on Friday and the fact that she was still upset about the conduct. *Id*. The exact content of the discussion from that point on is a matter of dispute. Exhibits 17, 18.

Wolfe called Parker on his cell phone at approximately 6 p.m. on Sunday. Parker 62-64; Exhibit 13. Parker told Wolfe that he would come to the Salisbury facility on Monday morning and would resolve the situation. Parker 64-65.

The next morning, Parker arrived at the Salisbury facility before Wolfe's scheduled arrival time. *Id*. at 66. She did not report to work as scheduled. *Id*. at 66-67. Parker was informed by a scheduling coordinator that Wolfe had called in to state that she was "at the courthouse" and would be late. *Id*. at 67-68. When Wolfe finally arrived, Parker went to find her. *Id*. at 70. She informed him that she had obtained an *ex parte* peace order against Lenderking and provided him with a copy of the order. *Id*. at 70-74; Exhibits 14, 15; Wolfe 202-08.

Parker called Greene to inform him of the events of the morning and to seek guidance on how to proceed. Parker 74. Greene then called Lott to inform him that Dave Parker had reported that Patti Wolfe was causing problems at the Salisbury site. *Id*. at 75; Exhibit 1 ¶13. Lott had several conversations with Parker. Exhibit 1 ¶13; Parker 80, 95-96. Through those conversations, Lott learned that Mr. Parker had become aware that the other Salisbury MRI techs had complained about Patti Wolfe bringing personal problems to work and treating them abusively. Exhibit 1 ¶13; Exhibit 12; Parker 98, 105-07. Parker also informed him of the interaction between Wolfe and Lenderking and the Peace Order Wolfe had given him. Exhibit 1 ¶13.

Parker spoke to Lenderking and obtained her version of the events. Parker 76-77, 80-81. He asked Wolfe and Lenderking to provide him with written statements regarding the events of Friday and Saturday. Parker 72-73, 76, 78-80; Wolfe 208-09. Lott told Parker that he should ask the other three Salisbury technologists to provide written statements describing their work relationship with Ms. Wolfe. Exhibit 1 ¶14. Parker faxed the Wolfe and Lenderking statements and the peace order documents to Lott, and asked the other Technologists to provide statements. Parker 76, 82-84.

Lott had discussions with Dr. Platenberg and with other Med-Tel personnel, including Greene and Robert Klein, Med-Tel's Executive Vice President for Law, on May 6 and 7 regarding what should be done with respect to Ms. Wolfe. Exhibit 1 ¶15; Klein 52-53, 59-63. These conversations focused upon the problems Ms. Wolfe was creating at the Salisbury site through her poor interpersonal relations with the other Technologists and the fact that she was continuing to have lengthy personal telephone calls with her Ohio paramour during working time and at Med-Tel's expense after being warned that that conduct was not acceptable. Exhibit 1 ¶15.

The consensus of these discussions was that Ms. Wolfe had not taken advantage of the opportunity for a new start provided by the move from the Toledo to the Salisbury and that she was again allowing personal problems outside of work to interfere with her work and disrupt the workplace. *Id.* There was a fear that Ms. Wolfe's behavior would lead the one or more of the other Technologists in the Salisbury office to leave Med-Tel.[8] *Id.*

---

[8]    Qualified MRI Technologists were scarce in the Salisbury area, and Med-Tel would have difficulty replacing Technologists who resigned. Exhibit 1 ¶15 n.1.

Although calls on Med-Tel's 800 line are "free" to the caller, Med-Tel pays for the calls on a time basis. Exhibit 1 ¶16. The lengthy calls from Wolfe's paramour during the month from mid-March through mid-April 2002 alone cost approximately Med-Tel $125. *Id*. The calls on the 800 line were viewed not only as abuse of time that Wolfe was supposed to be working and disregard of the prior warnings, but as dishonesty, because they appeared to be a means of making the calls at Med-Tel's expense in a surreptitious manner. *Id*.

These factors led Med-Tel to decide that Wolfe's employment should be terminated. Exhibit 1 ¶17. In the late morning of May 7, Lott informed Parker that this was decision had been made, provided that the statements from the other technologists supported Mr. Parker's report regarding Wolfe creating an unpleasant work environment. *Id*. Lott informed David Parker via e-mail of the reasons for the termination and how he should inform Ms. Wolfe of the termination. *Id*.; Exhibit 22.

After the e-mail, David Parker faxed the statements of the other Technologists to Lott. Exhibit 1 ¶18; Parker 92-93, 109-110; see Exhibits 19-21. After reviewing them and seeing that the other technologists had confirmed that Ms. Wolfe was bringing her personal problems to work and creating an unpleasant working environment, Lott told Mr. Parker to proceed with the termination. Exhibit 1 ¶18; Parker 110-112. Parker terminated Wolfe in accordance with these instructions. Parker 112-13, 116-17; see Exhibit 23.

## III.   ARGUMENT

Summary judgment is appropriate where the pleadings, deposition testimony, affidavits and other discovery materials "show that there is no genuine issue of material fact and that the

moving party is entitled to judgment as a matter of law."  Rule 56(c), F.R.Civ.P.;  see *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).   A material fact is one "that might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  In order to show a "genuine" issue of material fact, the non-moving party "must produce 'specific facts showing that there is a genuine issue for trial,' rather than resting upon the bald assertions of his pleadings.'"  *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir. 1985).

Summary judgment is mandated where, after adequate time for discovery, a party fails to make a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex supra.*  "'A mere scintilla of evidence is not enough to create a fact issue; there must be evidence on which a jury might rely.'"  *Barwick v. Celotex Corp.,* 736 F.2d 946, 958-59 (4th Cir. 1984), *aff'd,* 388 F.2d 987 (4th Cir. 1967)).

In this case, while there are many disputed facts, there is no genuine dispute regarding the material facts that entitle Med-Tel to summary judgment.  Undisputed facts demonstrate that the majority of Wolfe's claims are time barred.  There is no evidence to support her allegation that her termination was in retaliation for her prior complaint of sexual harassment, and no evidence to support her generalized allegations of a continuing pattern of retaliations.

A.    **W**OLFE'S **C**LAIMS OF **S**EXUAL **H**ARASSMENT ARE **B**ARRED BY THE **A**PPLICABLE **S**TATUTE OF **L**IMITATIONS

Under Title VII, a plaintiff must file an administrative charge of employment discrimination with the Equal Employment Opportunity  Commission (hereafter, "EEOC") prior

to filing suit under Title VII.  42 U.S.C. § 2000e-5(e)(1). This charge must be filed in either 180 or 300 days after an alleged unlawful employment practice occurred, depending upon whether the jurisdiction in which the charge is filed is one with a state or local fair employment practices deferral agency.  *National Rail Passenger Corp. v. Morgan*, 536 U.S. 101, 119, 122 S. Ct. 2061, 2070 (2002).

In this case, it does not matter whether the 180-day or 300-day period applies.     Here, Plaintiff filed a charge of discrimination on June 19, 2002.  Thus, the 300-day period began on September 22, 2001.  No event alleged by Plaintiff, other than the termination of her employment, occurred during this 300-day period.

The act of filing a charge of discrimination within the statutory time period is mandatory. *Amtrak*, 536 U.S. at 119, 122 S. Ct. at 2070.  In *Amtrak*, the Court prefaced its analysis of Title VII's time limitations by stating that "strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law."  *Mohasco Corp. v. Silver*, 477 U.S. 807, 826, 100 S. Ct. 2486 (1980).

A plaintiff's failure to file a timely charge of discrimination with respect to an employment action bars her from bringing suit under Title VII regarding that action.  *Amtrak*, 536 U.S. at 119-120, 122 S. Ct. at 2070.  A narrow exception exists for certain actions that can be considered "continuing violations" as defined in the *Amtrak* decision – specifically, for a charge alleging a hostile work environment, "so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the [Title VII] time period."  536 U.S. at 127, 122 S. Ct. at 2077.

In Count I of her Complaint, Wolfe alleges that she was subject to hostile environment sexual harassment, specifically, "a sexually hostile and offensive workplace environment that was effectuated through a continuous, unbroken course of conduct beginning in 1999 and extending through Ms. Wolfe's wrongful termination." Complaint, ¶¶18. Unfortunately for Wolfe, her testimony does not live up to this eloquent assertion. In her testimony, Wolfe described only two possible situations that could be considered hostile environment sexual harassment – the conduct that occurred from late 1999 or early 2000 until the termination of Barnes in October 2000 and the encounter with Coleman in December 2000. Barnes' employment terminated in October 2000; there can be no allegation that he continued to harass her. Plaintiff concedes that Greene did not engage in any conduct that would constitute sexual harassment after the Barnes forced resignation.[9] See p.5, n.5 *supra.* Plaintiff does not allege that Mr. Coleman had any improper interaction with her after December 2000. Wolfe conceded that Parker never engaged in any sexual harassment or improper conduct. Wolfe 179-80.

Wolfe has not presented evidence from which a finder of fact could conclude that she suffered any act of sexual harassment that occurred with Title VII's limitations period. Her claims of sexual harassment are time barred, and Med-Tel is entitled to summary judgment with respect to Count I of her Complaint

**B.  THERE IS NO EVIDENCE TO SUPPORT WOLFE'S CLAIM THAT HER MAY 2002 TERMINATION WAS IN RETALIATION FOR HER COMPLAINT OF SEXUAL HARASSMENT:**

The only event alleged by Wolfe that falls within the Title VII limitations period is her

---

[9]  Wolfe's generalized allegations that she was hazed, shunned and ostracized for her refusal to condone or participate in such conduct are not only not supported by even her own testimony, but they would not constitute sexual harassment even if they did .

termination, which occurred in May 2002.  Wolfe has alleged that this termination was "in reprisal for her engaging in the protected activity of opposing sexual harassment and gender discrimination and complaining against such conduct directed, not only against herself, but against others."  Complaint ¶22.  Wolfe provided no direct evidence that her termination was motivated in any way by and protected conduct, but instead bases this claim upon her personal belief that "the whole atmosphere of the place at Med-Tel was against me because of the Mike Barnes incident" and that Mike Greene "was the one calling the shots."  Wolfe 263-64.

Title VII makes it an "unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a).  In analyzing claims under this section, where there is no direct evidence of discrimination, the Court of Appeals has applied the burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See Smith v. First Union Nat'l Bank*, 202 F.3d 234, 248 (4th Cir. 2000). Initially, to establish a *prima facie* case, the employee must show that: "(1) she engaged in a protected activity; (2) the employer took an adverse employment action against her; and (3) a causal connection existed between the protected activity and the asserted adverse action." *Von Gunten v. Maryland*, 243 F.3d 858, 863 (4th Cir. 2001), *citing Beall v. Abbott Labs*., 130 F.3d 614, 619 (4th Cir. 1997);  s*ee Thompson v. Potomac Elec. Power Co.,* 312 F.3d 645, 650 (4th Cir. 2002);  *Haulbrook v. Michelin North Am.,* 252 F.3d 696, 706 (4th Cir. 2001); *Beall v. Abbott Labs.*, 130 F.3d 614, 619 (4th Cir. 1997). Once the employee establishes a *prima facie* case of retaliation, the burden shifts to the employer to produce a legitimate, nondiscriminatory reason for the adverse action.  *Id.*

The burden then shifts back to the employee to prove that the employer's purported reason for the action was mere pretext for retaliation. *Id.* The employee accomplishes this by showing " 'both that the reason was false, and that discrimination was the real reason' for the challenged conduct." *Jiminez v. Mary Washington College*, 57 F.3d 369, 378 (4th Cir. 1995) (*quoting St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)) (*emphasis in original*). The plaintiff always bears the ultimate burden of persuading the trier of fact that she was the victim of retaliation. *See Beall*, 130 F.3d at 619.

Here, Med-Tel has articulated a legitimate non-discriminatory reason for Wolfe's termination – the fact that her behavior toward co-workers created an unpleasant working environment for them and that she was engaging in lengthy personal telephone calls during her working hours at Med-Tel and at Med-Tel's expense after being warned that the calls must stop. Wolfe has not presented any evidence to persuade a trier of fact that these reasons are not true or to that Med-Tel was motivated by her complaints of harassment almost two years earlier, rather than her behavior in the spring of 2002.

Indeed, the lapse of more than almost two years from Wolfe's participation in the Barnes investigation (and almost a year and a half from the alleged incident with Coleman) and the alleged retaliatory termination dispels any inference that they were causally connected. "[A] lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action ... negates any inference that a causal connection exists between the two." *Church v. Maryland,* 180 F. Supp. 2d 708, 745 (D. Md.) (quoting *Dowe v. Total Action Against Poverty,* 145 F.3d 653, 657 (4th Cir. 1998)), *aff'd,* 53 Fed. Appx. 673 (4th Cir. 2002). See *Parkinson v. Anne Arundel Medical Ctr.*, 214 F. Supp. 2d 511, 518 (D. Md.

2002) (stating that a lapse of more than one year between protected activity and an adverse

action does not support an inference of causation).

The record reveals nothing, other than Wolfe's speculation, to support her claim that her

termination was based upon protected activity. Accordingly, Med-Tel is entitled to summary

judgment with respect to this claim.

**C.    THERE IS NO EVIDENCE OF ANY "CONTINUING VIOLATION" OF RETALIATION**

.In Count II of the Complaint, Plaintiff alleges that Med-Tel "retaliated against …[her] by

denying her promotion and ultimately firing her" for opposing conduct prohibited by Title VII

and complaining about such conduct. Complaint, ¶22. The first of these actions – the denial of

promotion – is alleged to have occurred at the beginning of 2001 – a year and a half before she

filed her administrative charge of discrimination. Title VII's statute of limitations bars this

claim. See pp. 12-13 *supra*.

In an apparent attempt to avoid application of the Title VII limitations period, Plaintiff

has attempted to cast all of the actions alleged in the Complaint as a "continuing violation."

Wolfe alleges that "Med-Tel's retaliatory vendetta against Ms. Wolfe was perpetrated through a

continuous, unbroken policy and course of action, implemented beginning in 1999 and

continuing through her termination." Complaint ¶22. Again, this dramatic statement is not

supported by the evidence in this case and would not, in any event, save Wolfe's claim regarding

the promotion.

The *Amtrak* decision, which arose in a similar context where an employee was alleging

that a series of actions constituted racial discrimination and retaliation, demonstrates that

assertions of "continuing violation" will not serve to extend the Title VII limitations period.

The Supreme Court expressly rejected any argument that any employment action other than a hostile environment claim could be considered a "continuing violation." With respect to employment decisions, the Court stated, "A discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.' A party, therefore, must file a charge within either 180 or 300 days of the date of the act or lose the ability to recover for it." *Amtrak*, *supra*, 536 U.S. at 120, 122 S. Ct. at 2070-71.

Allegations that a particular discriminatory act is part of a "practice" do not convert discrete acts into a continuing unlawful practice for purpose of extending the 300-day limitations period, even where the party has alleged that the acts were taken for a related purpose. 536 U.S. at 120-21, 122 S. Ct. at 2071. As the Court stated:

> Discrete acts such as termination, failure to promote, denial of a transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable "unlawful employment practice.

536 U.S. at 123, 122 S. Ct. at 2073. This language forecloses any attempt by Plaintiff to assert that her failure to receive promotion to a Chief Technologist position was part of any continuing violation. The failure to promote occurred a year and a half before Plaintiff filed her charge of discrimination and is clearly time-barred.

In any event, there is no evidence that the promotion decision was motivated by retaliation. Med-Tel has articulated a legitimate non-discriminatory reason for Parker's selection – the selection panel's assessment that he possessed better qualifications in the areas of prior supervisory experience, his concept of a "team player," his ideas regarding how he would transition to the supervisor role, and the changes he thought would improve the imaging work done at the facilities the Regional Chief Technologist would supervise. Relative employee

qualifications are widely recognized as valid, non-discriminatory bases for a selection decision. *Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 960 (4th Cir. 1996). Employers have the "discretion to choose among equally qualified candidates provided the decision is not based upon unlawful criteria." *Id.*

Plaintiff has presented no evidence that this assessment was a pretext or that the panel was motivated by retaliation. The bases for Wolfe's claim that Parker's promotion was retaliatory appear to be her allegations regarding the interaction between her and Ron Coleman, the President and CEO of Med-Tel[10], at a dinner that occurred after a December 2000 training meeting, and her personal opinion that she was better qualified than Parker for the position because "she was practically doing the chief technologist job already." Wolfe 115-116.

The first assertion is based upon unfounded speculation. There was considerable dispute between the testimony of Wolfe and Ron Coleman regarding the events that took place at the dinner after the December 2000 training session (see Coleman 40-44, 49-52; Klein 69-71), but even crediting Wolfe's version of the events would not provide a basis for denial of summary judgment.

The record establishes that Coleman did not play any role in the selection of employees at the Regional Chief Technologist level; he was involved in such decisions only for employees at the senior executive level. Coleman 14-16*; see, e.g.,* Coleman 19-20 (Coleman heard about the Barnes termination after the fact), 22-23 (Coleman met Greene after he was hired), 25 (Coleman met Parker after he was hired), and 36 (Coleman heard about Wolfe's termination after the fact).

---

[10]    Coleman 7-8.

Plaintiff presented no evidence that Coleman played any role in Mr. Parker's selection; all record evidence was to the contrary. Coleman 26-27, 37-38, 53; *see p. 6 supra.*

Wolfe's opinion that she was better qualified than Parker is likewise insufficient to establish pretext. Wolfe claimed that she taught other Technologists, that she was more willing to give her time and effort to the company, that she had been a "leader" before and that Parker did not have as much experience as she did on all three of the types of machines used at Med-Tel. Wolfe 116-117. With respect to the "leader" allegation, Wolfe alleges that she was a night-shift "lead tech" for 10 months at Toledo Hospital, some time before coming to Med-Tel. Wolfe 119020. Wolfe did not mention this experience in her December 8 letter where she discussed her leadership qualifications for the position, nor did she recall mentioning it in her interview. Exhibit 6; Wolfe 174. The remaining allegations are based upon Wolfe's personal belief, inadmissible hearsay and rumor.

A plaintiff's assertions concerning her own qualifications and the shortcomings of her co-workers are not sufficient to demonstrate pretext. See *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 245 (4th Cir. 1982); *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980). "It is the perception of the decision maker which is relevant," not the self-assessment of the plaintiff. *Smith*, *supra*, 618 F.2d at 1067; *Evans, supra*, 80 F.3d at 960-61.

Here there is ample evidence that the decision makers were motivated by Parker's superior qualifications. Moreover, there is objective evidence that Parker possessed superior leadership experience: He had been a supervisor of the MRI area at Milford Memorial Hospital from November 1992 until July 1996 and was a Lt. Colonel in the National Guard, commanding a 500-soldier unit (the 115th Military Police Battalion). Parker 8-9; 16-18; Exhibits 7, 8.

Wolfe's claims that Parker's selection was made to retaliate against her in violation of Title VII are not supported by evidence.  Moreover, her claim with respect to the promotion is time-barred.  Med-Tel is entitled to summary judgment with respect to her promotion claims.

Wolfe's diffuse continuing violation retaliation claims are similarly not supported by evidence.  The starting point for examining these claims is the second prong of the *prima facie* case, the requirement that the plaintiff show that the employer took adverse action against her. The Court of Appeals for the Fourth Circuit has stated that adverse employment action may include any retaliatory act or harassment only if that act or harassment results in an adverse effect on the "terms, conditions, or benefits" of the plaintiff's employment.  *Von Gunten v. Maryland,* 243 F.3d 858, 865-66 (4th Cir. 2001), *citing Munday v. Waste Management of North America*, 126 F.3d 239, 243 (4th Cir. 1997);  *Thompson, supra*, 312 F.3d at 650-651. Employment actions are not deemed to be adverse where pay, benefits, and level of responsibility remain the same.  *Watts v. Kroger Co*., 170 F.3d 505, 512 (5th Cir. 1999)  A supervisor's treatment of an employee rudely and uncivilly does not amount to an adverse employment action, nor do negative performance evaluations, even if undeserved.  *Boriski v. City of College Station*, 65 F.Supp.2d  493 (S.D. Tex. 1999).

Retaliatory harassment can constitute adverse employment action only if such harassment adversely affects the "terms, conditions, or benefits of the plaintiff's employment."  *Von Gunten*, 243 F.3d 869-70.   For a hostile work environment claim to lie, there must be evidence of conduct severe or pervasive enough to create "an environment that a reasonable person would find hostile or abusive."  *Id*., *citing Harris v. Forklift Sys., Inc*., 510 U.S. 17, 21, 114 S.Ct. 367,

(1993).  A plaintiff's burden of proof in this regard is twofold:  she must show that her workplace was both subjectively and objectively hostile.  *Id*.  Wolfe has not done so.

Wolfe claimed that Greene was angry at her after Barnes' forced termination (and after Greene was allegedly disciplined for his own harassment) and that Greene refused to speak with her or acknowledge her in the office.  Wolfe 102-03.  She generally alleges that he should have been providing her with information regarding changes in protocols during the period he was her supervisor (*i.e*., from the time of Barnes's forced resignation until he was replaced by David Parker in January 2001).  Wolfe 102-04.  Wolfe did not identify any negative consequences that occurred as a result of this alleged behavior.

Wolfe also alleged in her answer to interrogatories that she was "held to an exacting schedule" unlike other employees.  Ex. 3.  When asked about this at her deposition, she testified that everyone had to sign in and out on a computer and that the only employee who was not held to a schedule was Christina Byrd.  Wolfe 258-61.  Wolfe asserted that Christine Byrd was having an affair with Ron Greene for approximately one year prior to Wolfe's termination.   Wolfe 58-61.

There is no evidence from which a trier of fact could conclude that the latter actions, if they occurred, were based upon Wolfe's protected activity.  Wolfe's testimony infers that the action took place because Byrd was Wolfe's paramour, which is not a retaliatory motive.

In any event, these allegations demonstrate an adverse employment action.  They do not constitute the severe or pervasive actions that are necessary to sustain a claim of a retaliatory hostile environment.   Accordingly Med-Tel is entitled to summary judgment with respect to Wolfe's continuing violation claims.

## IV.     CONCLUSION

The evidence adduced through discovery in this case and the grounds and authorities set forth above demonstrate that there is no genuine issue of material fact in this case and that Defendant Med-Tel International, Inc. is entitled to summary judgment in this case.  Defendant requests that judgment be entered in its favor, that Plaintiff Patrice Wolfe's claims be dismissed in their entirety and that Defendant be awarded its costs, including attorneys' fees, incurred in defending against this case.

Respectfully submitted,

/s/_____
Jeanne M. Phelan
WHITEFORD, TAYLOR & PRESTON L.L.P.
Seven Saint Paul Street, Suite 1300
Baltimore, Maryland 21202-1626
(410) 347-8738

Attorneys for Defendant,
Med-Tel International Corporation

*1550607*