THOMAS E. CASSAT                          *       IN THE

    Plaintiff                            *       CIRCUIT COURT

v.                                        *       FOR

OEAN PINES ASSOCIATION, INC., et al. *    WORCESTER COUNTY

    Defendants                           *       STATE OF MARYLAND

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION TO DISMISS OF DEFENDANT DAVID FERGUSON

Plaintiff through counsel responds in opposition to the Motion to Dismiss of Defendant David Ferguson ("Mr. Ferguson") as follows:

1.  Mr. Ferguson has moved to dismiss on the grounds he is immune under Real Property § 14-118(b) and Courts and Judicial Proceedings § 5-422(b) of the Annotated Code of Maryland.

2.  The Motion should be denied, because the statutes Mr. Ferguson relies on provide that he is subject to personal liability for acts undertaken in bad faith or in a reckless, wanton for grossly negligent manner. Plaintiff's Complaint is sufficiently framed to exempt Mr. Ferguson from immunity, and his conclusory affidavit that he bore Plaintiff no ill will does not justify dismissal of Plaintiff's Complaint as a matter of law.

3.  Mr. Ferguson also contends Plaintiff's punitive damage claim should be dismissed. This contention should be rejected because the statues in question do not expressly preclude punitive damages in cases where there is no immunity.

WHEREFORE, it is respectfully requested this Honorable Court deny the Motion to Dismiss of Defendant David Ferguson, and grant Plaintiff such other and further relief as the nature of his cause may warrant.

                                      /s/

Robin R. Cockey, Federal Bar No. 02657
COCKEY, BRENNAN & MALONEY, PC
313 Lemmon Hill Lane
Salisbury, MD 21801
(410) 546-1750
(410) 546-1811 Fax

Attorneys for Plaintiff

| | | |
|---|---|---|
| THOMAS E. CASSAT | * | IN THE |
| Plaintiff | * | CIRCUIT COURT |
| v. | * | FOR |
| OEAN PINES ASSOCIATION, INC., et al. | * | WORCESTER COUNTY |
| Defendants | * | STATE OF MARYLAND |

\* \* \* \* \* \* \* \* \* \* \* \*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 12th day of May, 2004, an exact copy of the foregoing Plaintiff's Response in Opposition to Motion to Dismiss of Defendant David Ferguson, along with the accompanying memoranda and exhibits was sent by regular U.S. mail, first class postage prepaid, to:

Robert C. Verderaime, Bar No. 00581
Verderaime & DuBois, P.A.
1231 N. Calvert Street
Baltimore, MD 21201

Joseph E. Moore, Bar No. 06240
Williams, Moore, Shockley & Harrison
3509 Coastal Highway
Ocean City, MD 21842

_____/s/_____
ROBIN R. COCKEY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

THOMAS E. CASSAT                          *

    Plaintiff                              *

v.                                        *        Civil No. AMD-04-CV-801

OEAN PINES ASSOCIATION, INC., et al.      *

    Defendants                          *
\*       \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

## PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION TO DISMISS OF DEFENDANT DAVID FERGUSON

Plaintiff through counsel responds in opposition to the Motion to Dismiss of Defendant David Ferguson ("Mr. Ferguson") as follows:

1.    Mr. Ferguson has moved to dismiss on the grounds he is immune under Real Property § 14-118(b) and Courts and Judicial Proceedings § 5-422(b) of the Annotated Code of Maryland.

2.    The Motion should be denied, because the statutes Mr. Ferguson relies on provide that he is subject to personal liability for acts undertaken in bad faith or in a reckless, wanton for grossly negligent manner. Plaintiff's Complaint is sufficiently framed to exempt Mr. Ferguson from immunity, and his conclusory affidavit that he bore Plaintiff no ill will does not justify dismissal of Plaintiff's Complaint as a matter of law.

3.    Mr. Ferguson also contends Plaintiff's punitive damage claim should be dismissed. This contention should be rejected because the statues in question do not expressly preclude punitive damages in cases where there is no immunity.

WHEREFORE, it is respectfully requested this Honorable Court deny the Motion to Dismiss of Defendant David Ferguson, and grant Plaintiff such other and further relief as the nature of his cause may warrant.

_____/s/_____
Robin R. Cockey, Federal Bar No. 02657
COCKEY, BRENNAN & MALONEY, PC
313 Lemmon Hill Lane
Salisbury, MD 21801
(410) 546-1750
(410) 546-1811 Fax
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

THOMAS E. CASSAT                         *

    Plaintiff                            *

v.                                       *        Civil No. AMD-04-CV-801

OEAN PINES ASSOCIATION, INC., et al. *

    Defendants                           *

*    *    *    *    *    *    *    *    *    *    *    *

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 12th day of May, 2004, an exact copy of the foregoing Plaintiff's Response in Opposition to Motion to Dismiss of Defendant David Ferguson, along with the accompanying memoranda and exhibits was sent by regular U.S. mail, first class postage prepaid, to:

    Robert C. Verderaime, Bar No. 00581
    Verderaime & DuBois, P.A.
    1231 N. Calvert Street
    Baltimore, MD 21201

    Joseph E. Moore, Bar No. 06240
    Williams, Moore, Shockley & Harrison
    3509 Coastal Highway
    Ocean City, MD 21842

                         _____/s/_____
                         ROBIN R. COCKEY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

THOMAS E. CASSAT                              *

      Plaintiff                          *

v.                                           *        Civil No. AMD-04-CV-801

OEAN PINES ASSOCIATION, INC., et al. *

      Defendants                         *

*     *     *     *     *     *     *     *     *     *     *     *

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION TO DISMISS OF DEFENDANT DAVID FERGUSON

Plaintiff Thomas E. Cassat ("Mr. Cassat"), formerly employed as Golf Superintendent by Defendant Ocean Pines Association, Inc. ("Ocean Pines"), has brought this action against Ocean Pines and his former supervisor, Ocean Pines General Manager David Ferguson ("Mr. Ferguson").  Mr. Cassat has asserted claims for breach of contract, false light defamation and defamation against Ocean Pines, as a result of Mr. Ferguson's allegedly disparaging him and disclosing confidential information, in violation of a written agreement entered into by Mr. Cassat and Ocean Pines on the occasion of Mr. Cassat's resignation.  Ocean Pines has answered Mr. Cassat's Complaint.

Mr. Cassat's claims for false light defamation and defamation are also asserted against Mr. Ferguson, individually, Mr. Cassat alleges Mr. Ferguson publicly disparaged him and disclosed confidential information, knowing that his actions violated the underlying agreement and knowing that his disparaging comments were false.  Mr. Ferguson has moved to dismiss, relying upon Real Property § 14-118(b) and Courts and Judicial Article § 5-422(b) of the Annotated Code of Maryland.  The statutes relied upon by Mr. Ferguson generally immunize agents of Associations such as Ocean Pines from personal liability for torts committed within the scope of their employment.  However, the statutes relied upon by Mr. Ferguson explicitly impose personal liability upon agents such as Mr. Ferguson for misconduct undertaken in bad faith or in a reckless, wanton or grossly negligent manner.  Accordingly, Mr. Ferguson's motion should be denied as to liability.

Both Ocean Pines and Mr. Ferguson have moved to dismiss Plaintiff's claim for punitive damages.  However, the statute they cite, Courts and Judicial Proceedings Article § 5-422, does not expressly preclude recovery for punitive damages, and its recitation that a lawsuit may be brought "for the actual damages sustained" was obviously intended to apply to cases in which there was no allegation of bad faith or intentional misconduct.  Accordingly, Defendant's motion should be denied as to punitive damages.

## STANDARD OF REVIEW

In assessing a Motion to Dismiss, the Court must assume the truth of Plaintiff's allegations and all inferences must be drawn in Plaintiff's favor.  <u>Edwards v. City of Goldsboro</u>, 178 F3d. 231, 244 (4th Cir. 1999).

The fundamental principle of pleading in the Federal System is that the Plaintiff need only provide a short and plain statement of her claim.  Fed. R Civ. P8(a).  The Supreme Court has rejected fact pleading requirements, heightened pleading standards, immediate dismissal of cases in which recovery by the Plaintiff seems remote or deviations from the principle of notice pleading that is the animating spirit of the Federal pleading rules.  See, e.g., <u>Letterman v. Tarrant County Narcotics Intelligence & Coordination Unit</u>, 507 US 163 (1993) (rejecting a heightened pleading standard in cases alleging municipal liability under 42 U.S.C. §1983); <u>Conley v. Gibson</u>, 355 US 41, 47-48 (1957) (holding that the rules "do not require a claimant to set out in detail the facts upon which he bases his claim.")  See, also <u>Scheuer v. Rhodes</u>, 416 US 232, 236 (1974) ("when a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one.  The issue is not whether a Plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.  Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test.")  See, also, <u>Swierkiewicz v. Sorema NA</u>, 122 S.Ct 992, 997 (2002), and <u>Gorski v. New Hampshire Department of Corrections</u>, 290 F 3d 466, 469-70 (1st Cir. 2002).

# **ARGUMENT**

In his Complaint, Mr. Cassat alleges he entered into an agreement with Ocean Pines to regulate the terms of his resignation (Complaint, paragraph 7). Mr. Cassat alleges the agreement contained a confidentiality clause (Id.), a disparagement prohibition (Id., paragraph 8), and a requirement that the parties and their agents characterize his separation from employment as a "resignation in good standing" (Id.). The Complaint goes on to recite that, almost immediately following Mr. Cassat's resignation, Mr. Ferguson, Ocean Pines' General Manager, told a reporter Plaintiff had been fired (Id., paragraph 9), and told an Ocean Pines contractor that Mr. Cassat was a "liar" and a "screw-up" (Id., paragraph 10). The Complaint further recites that, roughly six (6) months later, Mr. Ferguson made statements publicly and to reporters implying that Mr. Cassat had either been complicit in a subordinate's embezzlement or had allowed the embezzlement to occur through negligent supervision (Id., paragraph 11, 12, 13).

In characterizing Mr. Ferguson's state of mind, Mr. Cassat has alleged that Mr. Ferguson made his improper statements with "full knowledge" that they were "improper, false and in violation of the Ocean Pines Agreement" (Id., paragraph 9), that Mr. Ferguson "knowingly [made] these improper statements" in breach of the agreement between Ocean Pines and Mr. Cassat," (Id., paragraph 14), that Mr. Ferguson's improper statements "knowingly breached the agreement between Mr. Cassat and Ocean Pines," (Id., paragraph 16), that Mr. Ferguson "knowing portrayed Mr. Cassat in a false, negative light," (Id., paragraph 19), and that Mr. Ferguson "knew or reasonably should have known" that his false statements were "without objective basis" (Id., paragraph 22)

Mr. Ferguson has moved to dismiss on the grounds he is immune from personal liability taken on behalf of Ocean Pines, citing Real Property Article § 14-118(b) and Courts and Judicial Proceeding Article §5-422(b) of the Annotated Code of Maryland. Those statutes, however, do not immunize Mr. Ferguson from liability for willfully wrongful misconduct, and his motion should therefore be denied.

§ 14-118(b) of the Real Property Article provides that a person injured as a result of a tort by an officer or director of a governing body acting within the scope of his duties may recover only in an action brought against the governing body for the damages described in § 5-

3

422(b) of the Courts and Judicial Proceedings Article.  § 5-422(b) of the Courts and Judicial Proceedings Article essentially parrots the language of § 14-118(b) of the Real Property Article, providing that the remedy in such a scenario must be sought "in an action brought against the governing body for the actual damages sustained."  § 5-422(c) of the Courts and Judicial Proceedings Article, however, makes it clear that an agent of a governing body may be held personally liable if he did not act in good faith or acted in a reckless, wanton or grossly negligent manner.

Here, Plaintiff has explicitly alleged that Mr. Ferguson acted in a manner that was intentionally wrongful, with full knowledge of illegality and/or impropriety of his actions.  At this stage of the proceeding, those allegations must be taken as true, and viewed in the light most favorable to Plaintiff.   Edwards v. City of Goldboro, Supra, at 178 F 3d 244.

Mr. Ferguson has attempted to "plug" the statutory exception by tendering a conclusory affidavit to the effect that he bore Mr. Cassat no ill will.  It is, however, well established that summary judgment motions and other dispositive motions will not be granted on the basis of bald, conclusory allegations or averments:  "… [U]ltimate or conclusory  facts and conclusions of law … cannot be utilized on a summary judgment motion"  Wright, Miller & Kane Federal Practice & Procedure § 2738 (1998).  Certainly, in this case, the nature of the misconduct attributed to Mr. Ferguson is such that, if, indeed, Mr. Ferguson acted as alleged, and in the state of mind alleged, he did not act in "good faith" and exhibited – at a minimum – a reckless disregard for Plaintiff's well being.  The appropriateness of Plaintiff's imputation of bad faith to Mr. Ferguson is evidenced by Mr. Cassat's affidavit filed simultaneously with this memorandum, in which he details the background of his unpleasant and fractious relationship with Mr. Ferguson.  It is axiomatic that summary judgment is inappropriate where conflicting inferences may be drawn from the facts.  Morrison v. Nissan  Motor Corp., 601 F 2d 1396 (4th Cir. 1979), Charbonnages de France v. Smith, 597 F 2d 406 (4th Cir. 1979), Johson v. Helicopter & Airplane Service Corp., 389 F Supp 509 (D Md 1974), Macy v. Trans World Airlines, 381 F. Supp 142 (D Md 1974) and Byrd v. Local Union #24, Internation Brotherhood of Elec Workers, 375 F. Supp 545 (D Md 1974).  It has often been observed that questions of intent inherently turn on credibility issues and therefore are seldom appropriate for summary disposition.  Overstreet v. Kentucky Central Life Ins. Co., 950 F. 2d 931 (4th Cir. 1991), Prochaska v. Marcoux, 632 F. 2d 848 (10th Cir. 1980), cert den 101 S.Ct. 2316 and

<u>Consolidated Elec. Co. v. US For Use & Benefit of Gough Indus., Inc.</u>, 355 F. 2d 437, 438-39 (9th Cir. 1966). (For an in depth analysis of the inappropriateness of resolving credibility issues on summary judgment, see Wright, Miller and Kane, Op Cit., § 2726. In any event, it is inappropriate to foreclose factual issues and block discovery as to Mr. Ferguson's state of mind and motivations. See, <u>Wichita Falls Office Assoc. v. Bank One Corp.</u>, 978 F 2d 915(5th Cir. 1992), <u>Tempromandibular Joint (TMJ) Implant Recipients v. Dow Chem. Co.</u>, 113 F 3d 1484 (8th Cir. 1997), <u>Berkely v. Home Insurance Co.</u>, 688 F 3d 1409 (DC 1995).

Defendants further contend that, under the applicable statute, Courts and Judicial Proceedings Article § 5-422, punitive damages are not available. Defendant's contention is entirely founded upon a clause in § 5-422 which provides that, ordinarily, a Plaintiff injured by the agent of a governing body "may recover only in an action brought against the governing body for the actual damages sustained" (Id.) However, the balance of the statute provides that, where the agent has acted in bad faith or in a reckless, wanton or grossly negligently manner, he can be sued personally and subjected to personal liability (§ 5-422(c)). Nothing in this statute states or implies that, where a Plaintiff alleges the agent acted intentionally in bad faith, Plaintiff would be precluded from seeking punitive damages. Accordingly Defendant's motion should be denied as to punitive damages.

## <u>SUMMARY OF ARGUMENT</u>

Mr. Ferguson's Motion to Dismiss should be denied because Plaintiff's allegations are that Mr. Ferguson knowingly and intentionally disparaged Plaintiff and disclosed confidential information, in breach of Plaintiff's agreement with Ocean Pines, with full awareness that his conduct was wrongful. Plaintiff's allegations clearly characterize Mr. Ferguson's misconduct as having been undertaken in bad faith and in a reckless, wanton or grossly negligent manner. Under Real Property Article § 14-118(b) and Courts and Judicial Proceedings Article § 5-422(b) of the Annotated Code of Maryland, the statutes upon which Mr. Ferguson relies in claiming immunity, he is subject to personal liability because Plaintiff's allegations, if true, would bring him within an express statutory exception for misconduct undertaken in bad faith or in a reckless, wanton or grossly negligent manner.

## CONCLUSION

WHEREFORE, it is respectfully requested this Honorable Court deny the Motion to Dismiss of Defendant David Ferguson and grant Plaintiff such other and further relief as the nature of his cause may warrant.


_____/s/_____
Robin R. Cockey, Federal Bar No. 02657
COCKEY, BRENNAN & MALONEY, PC
313 Lemmon Hill Lane
Salisbury, MD 21801
(410) 546-1750
(410) 546-1811 Fax

Attorneys for Plaintiff

s:\staff\rcockey\active\cassat\affidavit of tom cassat     lc     05/12/04

*IN THE UNITED STATES DISTRICT COURT*
*FOR THE DISTRICT OF MARYLAND (NORTHERN DIVISION)*

| | | |
|---|---|---|
| PATRICE WOLFE | * | |
| Plaintiff | * | |
| v. | | Civil Action No. L02 CV-3965 |
| | * | |
| MED-TEL INTERNATIONAL CORPORATION | * | |
| Defendant | * | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Patrice Wolfe ("Ms. Wolfe"), formerly an employee of Med-Tel International Corporation (Med-Tel") has brought this sexual harassment suit under Title VII (42 USC §2000(e)), alleging she was subjected to hostile environment/sexual harassment (Count I) and fired in retaliation for complaining about and resisting sexual harassment (Count II). Ms. Wolfe contends that, shortly after going to work as an MRI technician in Med-Tel's Salisbury facility in 1999, she found herself in an offensive, sexually charged work environment in which obscenities, vulgar references to the sex act and demeaning, sexist remarks were common place. Ms. Wolfe further contends that, after she and a co-worker complained of the offensive environment, her supervisor chastised her for having complained and subjected her to a regimen of hazing and ostracization. Ms. Wolfe contends that the owner of the Company then encouraged her to apply for a promotion, a suggestion he accompanied with an explicit sexual advance. According to Ms. Wolfe, when she rebuffed the advance, she was denied the promotion. During the ensuing year, she contends Med-Tel management continued to manifest its hostility towards her, culminating in her termination on bizarre and manifestly pretextual grounds in May 2002. Med-Tel has now moved for summary judgment on the grounds her hostile environment/sexual harassment claim is time barred, and on the grounds her retaliation claim lacks evidentiary support. Med-Tel's motion should be denied in toto because the Record supports characterization of Ms. Wolfe's hostile environment/sexual

harassment claim as a continuing violation and the Record, viewed in the light most favorable to her, would allow the trier of fact to infer her termination was substantially motivated by a retaliatory <u>animus</u>.

## **STATEMENT OF FACTS**[1]

Ms. Wolfe began working for Med-Tel as an MRI Technologist in its Toledo, Ohio Facility in 1997 (Plaintiff's Sworn EEOC Charge, Exhibit 7).  In 1999, Mike Greene ("Mr. Greene"), a supervisor in Med-Tel's Mid-Atlantic region, proposed she relocate to Med-Tel's Salisbury, Maryland office, and she agreed (Id.).  Upon arriving in Salisbury, Ms. Wolfe was directly supervised by Lead Technologist Michael Barnes ("Mr. Barnes"), and indirectly by Mr. Greene, as manager of clinical operations (D's Answers to Interrogatories, Answer #1, Exhibit 1).  Mr. Greene & Mr. Barnes were close friends (Marshall Deposition, page 13, Exhibit 6; Parker Deposition, page 32, Exhibit 5).  Ms. Wolfe found the atmosphere in the Salisbury facility to be "sexually charged," with both Mr. Barnes and Mr. Greene telling dirty jokes, making vulgar comments about women's breasts, and maintaining a "boys club" atmosphere (Wolfe Deposition, pages 85 – 87, Exhibit 2).  Mr. Greene tolerated and in some respects amplified Mr. Barnes' sexual antics; Mr. Greene maintained pictures of naked men on his computer screen saver, which he made a point of showing to Ms. Wolfe on at least one occasion, and was a frequent giver and receiver of email jokes of a pornographic nature which he shared with Mr. Barnes and others (Id.).  Mr. Barnes, however, carried his sexual conduct and commentary beyond the level of mere banter, making sexual propositions of a supposedly facetious nature to female employees and uttering gross obscenities in the office (Id., Marshall Deposition, pages 8 -12, Exhibit 6).  On one occasion when Ms. Wolfe had the temerity to complain of his remarks, Mr. Barnes retorted to co-workers that he did not know why Ms. Wolfe was upset with him, as usually when he "fucked" someone he "moved his hips" and his partner "loved it" (Mr. Barnes' implication Ms. Wolfe had had sexual relations with him was groundless) (Plaintiff's Sworn EEOC Charge, Exhibit 7, Naser Memorandum, page 2, Exhibit 3 of Defendant's Motion for Summary Judgment).

Ms. Wolfe complained to Mr. Greene about Mr. Barnes' misconduct, but to no avail (Wolfe Deposition, pages 91 – 93, Exhibit 2).  When Ms. Wolfe received a mediocre

---

[1] Discovery produced few surprises in this case:  Most of the facts recited are supported by the affidavit filed in support of her EEOC charge, a copy of which is attached as Exhibit 7.

2

evaluation from Mr. Barnes, she complained to Mr. Greene that Mr. Barnes had downgraded her because she complained of his vulgarity, but Mr. Greene took no action (Id.).  Finally, Ms. Wolfe commiserated with a male supervisor at another site, Chris Sullivan ("Mr. Sullivan"), who advised her to report to Med-Tel's Human Resources office "because Mike Greene isn't going to do anything about it" (Wolfe Deposition, page 94, Exhibit 2).  When Ms. Wolfe demurred, Mr. Sullivan himself reported it to the Human Resources Department and Human Resource Officer Rebecca Naser ("Ms. Naser"), who commenced an investigation that resulted in Mr. Barnes' forced resignation. (Id, pages 94-101).

After Mr. Barnes' termination, Mr. Greene's sexually harassing behavior continued in part, at least to the extent of maintaining the obscene screen saver, and in-office discussion of pornographic jokes (Wolfe Affidavit, paragraph 2).  Mr. Greene's continuation of these computer screen improprieties remained a constant irritant, because the office layout of the Med-Tel workplace in Salisbury required Ms. Wolfe to enter Mr. Greene's office often (Wolfe Deposition, page 87, Exhibit 2).  Mr. Greene's sexual banter – on at least Ms. Wolfe's exposure to it – did significantly improve, however, if for no other reason than because Mr. Greene completely stopped talking to Ms. Wolfe or at any length to others in her presence (Wolfe Deposition, pages 88, 102-108, Exhibit 2; Wolfe Affidavit, paragraph 3; Plaintiff's Answers to Interrogatories, Answer Number 2, Exhibit 20).  Mr. Greene's ostracism was problematic, not only because it made it difficult for Ms. Wolfe to do her job, but because it affected the conduct of co-workers towards her, who made it clear they perceived her as a pariah, someone who could never advance in the company ranks.  (Wolfe Deposition, page 244 - 246, Exhibit 2).  When it was necessary for Mr. Greene to communicate with Ms. Wolfe, he would do so through Christine Byrd (later Christine Torres) ("Ms. Byrd"), another technologist with whom Mr. Greene was having an affair (Wolfe Deposition, pages 58 – 60, 110 - 111, Exhibit 2; Marshall Deposition, pages 11 - 12, Exhibit 6; Med-Tel Deposition, page 41, Exhibit 3).  Mr. Greene's utilization of his girlfriend as a favored communicant lead to office friction between Ms. Byrd, Ms. Wolfe and other technologists (Marshall Deposition, pages 15 - 17, Exhibit 6).

Ms. Wolfe complained to Ms. Naser, the Human Resource Officer called in to address Mr. Barnes' misconduct about Mr. Greene's ostracism (Wolfe Deposition, pages 102, 106,

Exhibit 2).  Ms. Wolfe told Ms. Naser "Mr. Greene wasn't speaking to me or acknowledging me in the office, basically ostracizing me," (Id., page 102), and told Ms. Naser that, in her view, she "was not being treated right by Mr. Greene" (Id., page 106).  Ms. Naser responded that "it was human nature because he was reprimanded because of the Mike Barnes deal" (Id., page 102).[2]  In the face of Ms. Naser's apathy, Ms. Wolfe decided to take up the matter with Mr. Greene herself (Id., pages 107-108):

> "I decided to go in and speak with Mr. Greene … I just told him my feelings and told him that … I wasn't the only one who complained about him and I wasn't the one who did the wrong things, it was Mike Barnes who did the things that were wrong, not me, and I didn't understand why he was treating me that way … I didn't understand why or how this was going to end, when was he going to communicate with me, and he made it known that it [was] probably never 'I'll never forgive you for what you did'" (Id.)

Ms. Wolfe duly reported Mr. Greene's threats to Ms. Naser, who again did nothing (Id., page 109).

In the fall of 2002, Med-Tel advertised to fill the Regional Chief Technologist position for the area that included the Salisbury and the Dover, Delaware sites (Wolfe Deposition, pages 154- 159, Exhibit 2; Parker Deposition, pages 36 – 52, Exhibit 5).

Ms. Wolfe and David Parker, ("Mr. Parker") the lone technologist assigned to the Dover, Delaware site, were widely regarded as the only technologist with experience and seniority to be eligible for the position (Id., Med-Tel Deposition, page 44).  In any event, both Ms. Wolfe and Mr. Parker applied to Mr. Greene for the position (Id.).  Not surprisingly, their receptions differed:  Mr. Greene failed even to acknowledge receipt of Ms. Wolfe's application until pressed by her, whereas, when Mr. Parker delivered his application, Mr. Greene admitted him to his office, where the two were closeted for an hour in apparent discussion of the promotion process (Wolfe Deposition, pages 154 – 159, Exhibit 2; Wolfe Affidavit, paragraph 6).  Although Mr. Parker had been with Med-Tel much less time then Ms. Wolf (having started in 1999), (see, Parker Deposition, page 13, Exhibit 5), the two applicants

---

[2] Also, Mr. Barnes and Mr. Greene were personal friends  (Parker Deposition, page 32, Exhibit 5).

were on the surface quite similar: both had previously served in "lead technologist" positions, (a function Ms. Wolfe filled – at least defacto- in the Salisbury facility at the time), their backgrounds were similar in terms of education and qualifications (Wolfe Deposition, pages 115 – 124, Exhibit 2; Parker Deposition, pages 7 – 31, Exhibit 5). Shortly thereafter, in December, 2000, Ms. Wolfe attended Med-Tel's annual Christmas party. The day after the Christmas party, the Company hosted a business meeting, following which the participants socialized in the lounge area of the hotel that hosted the conference. During the social hour, it is undisputed Ms. Wolfe and Ronald Coleman ("Mr. Coleman"), Med-Tel's owner and Chief Executive Officer, had an encounter. In Ms. Wolfe's account, the incident proceeded in this fashion:

> "…[H]e asked me if he could buy me a drink at the bar. So we went to the bar and we passed my husband, who was waiting for me at the bar, and we sat down at a table not far from … my husband … he started talking about the fact that he had always been interested in me, he always would see me from afar, and he wanted to get to know me … and I said something to him along the lines I thought he wanted to talk to me about the Chief Tech position. He said, Oh, you want the Chief Tech position, fine, you want it, you got it. And I laughed … and he started talking about having sex or the lack of [it] with his wife and how, you know, they are sex, once or twice a year and asked me if I liked to have sex and I told him that I didn't refer to that act as having sex, and he was talking about other things that he did in the privacy of his own bathroom or bedroom or wherever he did it. And then he asked me if I wanted to go get a room and he got up from the table … and he walked over like he was going to go to the front desk and he said I'll go get a room right now. And I said No, I don't think that would be a very good idea. Then he sat down and … I forgot to … mention the fact when he sat down at first he asked me if I was wired and if I had a tape recorder on … in light [of] the Mike Barnes incident which just happened, and he tapped his chest and said I don't either. And then he started talking about those other things … that I already mentioned, the fact that he had been attracted to me from afar. Then he jumped up and wanted to go get a room and I said I didn't think it would be a good idea. And I said,

5

you know, I think you should keep your voice down because there is a table of Med-Tel people right behind you and they are listening to everything you say … Chris Sullivan was one of them, Dave Parker was one of them and I believe Bill Zimmerman was there too … and he said he would like to talk to me more about the Chief Tech position and he asked me why I hadn't been to the London site yet and why I didn't go there and that he had a nice flat in London.  It wasn't much, he said, but it would do.  And then, you know, he had said something about the Chief Tech position and … I would like to talk more to you about that and I have CD that I want you to hear, would you come out to my car with me?  And I figured that because he had then started to talk about the Chief tech position and he knew those people were behind us, that that is specifically what he did want to talk about and there would nothing else going on because, you know, my husband [was] right there and he watched us and he watched us leave.  And I knew that my husband was there.  So we got out in the car and I sat down and he put on the Enya tape … CD he had just gotten and then he went to put his arm around me and tried to kiss me and I told him I had to go now … I left, I walked back in, it was apparent to me that he didn't want to talk about the Chief Tech position or anything else… (Wolfe Deposition, pages 148 – 152, Exhibit 2).

In the wake of Plaintiff's EEOC filing, Mr. Coleman provided a statement to Ms. Naser that portrayed Ms. Wolfe as the aggressor in their bar-room encounter but, significantly, did not dispute her claim he had tried to kiss her (See, Coleman Statement, Exhibit 8).  During his deposition, Mr. Coleman gave this account of the incident:

"…[S]he approached me and said she needed to talk and I said, 'ok, let's go talk.' and we went to the bar … and ordered a drink, and she told me that she had applied for a Regional Chief Tech position.  I asked her questions about that and, you know, what was it going to entail and who else was involved.  She then changed the topic of conversation to sex, which made me very uncomfortable, particularly knowing about the Mike Barnes situation.  Then I said, 'you know, Patti, for all I know, you may be taping this conversation.'  She said she wasn't, and so she proceeded to talk in a very

flirtatious manner.  To be very specific, she told me that her husband and she didn't have a satisfying relationship, that her husband couldn't satisfy her.  She made overt suggestions to me.  She said she had a room in the hotel.  Obviously, I knew she had a room in the hotel because she and her husband were staying in the room.  In fact, her husband was sitting near by in the bar.  And the conversation went on for awhile, and I thought, well, you know, this is interesting and somewhat bizarre.  I sought to change the topic of conversation to music, and I was talking to her about an Enya CD which I had just recently purchase.  And quite frankly, I was keen to leave there, and I said, 'I'm leaving.  If you would like to hear the song, you know, it's there.  You can come along; otherwise, I'm gong.'  She came, I put the CD on, she sat in the passenger seat, I sat in the driver's seat, I played the song, which ironically, the title of it is something like , "Adious …" and  I said, 'I'm leaving.'  I gave her sort of a good night kiss and I said, 'I'm leaving." (Coleman Deposition, pages 42-44).

When asked if he told her he was "attracted" to her, he responded, "I don't recall" (Id., page 51).  When asked if he had suggested to her that the two of them "might have a physical relationship," he answered, "I have no recollection" (Id.).

It is undisputed Mr. Coleman called Ms. Wolfe at work the next day (Wolfe Deposition, pages 152 - 153, Exhibit 2; Coleman Deposition, page 44, Exhibit 4; Marshall Deposition, page 19, Exhibit 6).  According to Mr. Coleman, he called because she had sent him an email stating she had enjoyed the evening, and he wanted to warn her not to send "anything suggestive or otherwise [since] email is, first of all, you know, it is not as private as people think …" (Coleman Deposition, pages 44 – 45, Exhibit 4).  Accordingly to Ms. Wolfe, the message was rather different:

"He said he hoped I didn't get you, meaning me, into any trouble with your husband and that he enjoyed our evening and that I could email him anytime because he was only one who read his email" (Wolfe Deposition, page 153, Exhibit 2).

7

After the Christmas party incident, Mr. Sullivan and other Med-Tel employees made her uncomfortable by suggesting to her that she had secured the Chief Regional Technologist position as a result of the encounter with Mr. Coleman (Wolfe Deposition, pages 152 - 153, Exhibit 2; Wolfe Affidavit, paragraph 5). Ms. Wolfe's perception of the "office climate" changed, however, as she quickly realized that the old perception that she was not going to advance up the company ladder had returned (Wolfe Affidavit, paragraph 5).

Shortly thereafter, Ms. Wolfe and Mr. Parker were interviewed for the promotion by a panel consisting of Charles Lott ("Mr. Lott"), Vice-President in charge of Human Resources, and two medical officers, (Wolfe Deposition, pages 164, 174, Exhibit 2; Lott Affidavit as Exhibit 1 to Defendant's Motion for Summary Judgment). According to Ms. Wolfe, the interview touched upon nothing of substance: The interviewers asked for nothing about her leadership style or about the leadership position she had previously held as a "lead technologist"(Wolfe Deposition, pages 119, 126, Exhibit 2). Subsequently, Ms. Wolfe received a telephone call from Mr. Lott informing her she did not get the position because Mr. Parker knew the job specifications better then she did (Wolfe Deposition, pages 175-176, Exhibit 2).

After Mr. Parker received the Chief Regional Technologist position, Ms. Wolfe's relations with Mr. Greene continued to be very bad (Wolfe Affidavit, paragraph 4). Mr. Greene continued to snub her, and, since she still had to interact with him regularly as a supervisor, it made her job more difficult (Id.). Mr. Greene patronized and belittled her, at one point disrupting a lecture on TMJ she was delivering to junior technologists (including Amy Lenderking, ("Ms. Lenderking"), the technologist involved in her subsequent termination), making fun of her and belittling her expertise (Wolfe Affidavit, paragraph 4). Meanwhile, in January, 2001, Ms. Naser telephoned her and arranged to meet her for lunch at a restaurant in Salisbury (Wolfe Deposition, pages 112- 113, Exhibit 2). During the ensuing meeting, Ms. Naser told her she wanted to meet with her because she had heard that Ms. Wolfe attributed her failure to receive the Chief Technologist promotion to the "Mike Barnes incident" (Wolfe Deposition, pages 113- 114, Exhibit 2). Ms. Naser's supposition that Ms. Wolfe felt she was better qualified than Mr. Parker and should have gotten the job was well founded: In her deposition, Ms. Wolfe pointed out that she knew how to handle more of the machines than Mr.

8

Parker, had leadership qualifications comparable to his, had greater seniority and experience, and was much more flexible in agreeing to work different shifts and schedules (Wolfe Deposition, pages 115 - 116, Exhibit 2).[3]  In any event, Ms. Wolfe had, as she put it, "put two and two together:"

> "Mr. Greene made it known that … he could never work with me again after the Mike Barnes incident, and part of the job for Chief Technologist was to be in communication directly with Mike Greene and since he already told me, no, I'm never going to talk to you again, I put two and two together." (Wolfe Deposition, page 114; see, also, Wolfe Affidavit, paragraph 3).

Ms. Wolfe also considered her rebuff to Mr. Coleman as likely to have chilled her chances of getting the promotion; observing in her deposition that Mr. Coleman had told her "he would make sure I got any position that I wanted," (Wolfe Deposition, page 144), she pointed out that "he asked me to go to bed with him, and I didn't do it, [and] that doesn't really go over well with men" (Id.).

Ms. Naser, while acknowledging Ms. Wolfe's feelings, tried to placate her with an indefinite offer of a "teaching" position in the future (Wolfe Deposition page 13).[4]  Ms. Naser went on to caution her, warning that, "If I was to make the move into management within the company … I needed to learn how to get along with men," (Wolfe Deposition, page 165), and offered to send her a self help book on how women can succeed in a male dominated environment (Id.).

Ms. Naser assured her she had not been passed over because of the Barnes incident (Wolfe Deposition, page 4 and 14), asserting Ms. Wolfe did not get the position because she had "less job knowledge" – a contention Ms. Wolfe regarded as indefensible (Wolfe Deposition, page 125; see, also Wolfe Deposition, pages 115 – 124).

---

[3] Ms. Wolfe's assertion that Mr. Parker was "rigid" in his willingness to work according to a certain schedule was well founded:  Mr. Parker had previously been terminated for his refusal to accept an assignment that would have extended his work day (See, Parker Deposition, pages 14 – 15, Exhibit 5).

[4] Ms. Naser's account of this meeting is strikingly different from that of Ms. Wolfe, contrast Wolfe Deposition, pages 112 – 117, 161 – 173, with Naser Affidavit, attached to Defendant's Motion for Summary Judgment as Exhibit 11.  It is also worthy of note that Ms. Naser asserts she followed up this meeting with a series of cautionary conferences and communications, which Ms. Wolfe flatly denies; see, Wolfe Deposition, pages 161 – 173.

Ms. Naser then brought up two issues concerning Ms. Naser's relationship with Med-Tel:  First, Ms. Naser told her she owed the company money (Wolfe Deposition, pages 128-129, Exhibit 2).  Ms. Wolfe realized this made reference to a loan Med-Tel had made her when she moved to Maryland (see, Med-Tel Deposition, pages 31 – 34, 61-62, Exhibit 3).  Ms. Wolfe pointed out Mr. Greene had already approached her about repayment, and she had authorized him to repay the balance via weekly payroll deductions of Fifty Dollars ($50) each; she pointed out that Mr. Greene had agreed to that arrangement, but for some reason had not implemented it (Id.).[5]  The second issue raised by Ms. Naser was that she had learned Ms. Wolfe had been making long distant calls on the company phone (Wolfe Deposition, pages 128 – 129, Exhibit 2).  Ms. Wolfe acknowledged that she had, and offered to reimburse the company immediately, an offer Ms. Naser rejected (Id.)[6]

In her affidavit filed in support of Defendant's Motion for Summary Judgment, Ms. Naser asserts she had several follow-up meetings or communications with Ms. Wolfe to caution her about her telephone habits and the status of her loan (Naser Affidavit, Defendant's Exhibit 11).  In her deposition, Ms. Wolfe flatly asserted these "never happened" (Wolfe Deposition, page 143, Exhibit 2).  It is undisputed, however, that Mr. Parker, as Ms. Wolfe's immediate supervisor never counseled or disciplined her in any way concerning either issue (Parker Deposition, pages 118 – 119, 125, Exhibit 5), even though Mr. Parker testified in his deposition that, whenever he became aware of any employee behavior problem, he counseled the employee immediately to avoid the necessity for further disciplinary action (Id., page 57).  Mr. Parker gave Ms. Wolfe an evaluation on August 6, 2001, in which he gave her an almost perfect evaluation, to which he added these comments:

---

[5] In Med-Tel's deposition, its corporate designee, Vice-President Robert Klein ("Mr. Klein"), acknowledged that the payments were taken out in a timely fashion, pursuant to agreement, and Ms. Wolfe was not in default under that arrangement (Med-Tel Deposition, pages 31 – 34, 61 – 62, Exhibit 3).

[6] In Med-Tel's deposition, Mr. Klein testified the investigation of Ms. Wolfe's long distance telephone call habits had been conducted by Mr. Greene (Med-Tel deposition, pages 61 – 62, Exhibit 3).  Ms. Wolfe, in her deposition, asserted that the practice of using the company phone to make and receive long distance calls of a personal nature was endemic; Ms. Wolfe testified that other technologists frequently called boyfriends, family members and other personal contacts around the country, some more then she (Wolfe Deposition, pages 129 – 137, Exhibit 2). Ironically, a co-worker, Erin Marshall ("Ms. Marshall") testified in her deposition that Ms. Byrd, a Salisbury based technologist with whom Mr. Greene had a relationship, carried on her affair with Mr. Greene through telephone calls made on the company phone (Marshall Deposition, page 12, Exhibit 6).

"Patti does an admirable job of balancing the needs of the team with her individual responsibilities.  She exhibits a high degree of openness and objectivity to the views of others.  She gives candid, constructive feedback and welcomes it from team members.  Patti works hard to build a positive team spirit and identity.  She puts the success of the team above her own interest … Patti shows a high degree of respect for customers through her courtesy and sensitivity.  She is very skillful at resolving difficult or emotional customer situations.  She often goes out of her way to make sure commitments are met and she responds with a strong sense of urgency when servicing customers.  Patti uses customer feedback to improve services … even under very unusual conditions not covered by the normal guidelines, Patti quickly sizes up the situation and determines the appropriate action.  … Patti is extremely thorough and proactive about keeping others well informed.  She implements highly effective and often innovative communication methods.  She displays very good verbal skills, communicating clearly and concisely.  Patti demonstrates excellent written communication skills.  She exhibits good listening skills and comprehends complex matters well… Patti is particularly successful at establishing and maintaining good relationships.  She exhibits a high degree of tact and consideration in her relations with others.  She regularly displays a positive outlook and pleasant manner.  Patti often extends herself more than required to assist and support her co-workers.  She demonstrates and promotes cooperation when working in group situations and she takes an active role in resolving conflicts before they get out of hand … Patti understands the Organization's policies and procedures and follows them closely.  She completes administrative tasks accurately and without follow-up.  Her actions and words show support for the Organization's goals and values.  … Patti is my most senior/experienced technologist in the Salisbury sites therefore I rely on her judgment to guide the rest of the technologist.  She has been a pleasure to work with.  She has been instrumental in the mentoring of new employees and the instruction of new CE-MRI techniques." (A copy is attached as Exhibit 9)

11

Although her relations with Mr. Parker were cordial and professional, Ms. Wolfe's problems with Mr. Greene continued (Wolfe Affidavit, paragraph 4; Wolfe Deposition, pages 110 – 111, Exhibit 2).  Meanwhile, Med-Tel hired Ms. Lenderking, and, since she had no prior MRI experience at all, entrusted her to Ms. Wolfe as the "lead tech" for training and mentoring (Wolfe Deposition, page 182, Exhibit 2).  Ms. Lenderking seemed excitable and flighty, and on one occasion was drawn into a shouting match with another employee, Robin Spahn ("Ms. Spahn")  (Wolfe Deposition, page 184, Exhibit 2; Marshall Deposition pages 13 – 15, Exhibit 6).  Ms. Wolfe perceived that Amy had difficulty concentrating and staying focused; when she counseled Ms. Lenderking to remain concentrated while working, Ms. Lenderking "got flippant with me" (Wolfe Deposition, pages 190 – 191, Exhibit 2).  Ms. Wolfe warned Mr. Parker of Ms. Lenderking's erratic, volatile behavior (Id., page 85).

On Friday, May 3, Ms. Wolfe was taken ill with a violent case of labyrinthitis, accompanied by symptoms of dizziness, nausea and vomiting (Id., page 192 – 193).  Nonetheless, Ms. Wolfe went to work (Id.).  When Ms. Wolfe arrived, violently ill, Ms. Lenderking was regaling her co-workers with an Elvis impersonation; when Ms. Wolfe "rolled her eyes," Ms. Lenderking "whipped around" in an exhibition of anger that left Ms. Wolfe "a little bit afraid of her and I think she knew it" (Id., page 192 – 193).  The rest of the day apparently passed without incident (Id.).  The next day, Saturday, May 4, Ms. Wolfe and her husband had gone to bed when the phone ran close to midnight (Wolfe Deposition, pages 194 – 198, Exhibit 2).  In her deposition, Ms. Wolfe described in detail what happened then:

"My son Brad answered the phone.  He brought the phone up to me he said Mom, I was sleeping and he was waking me up, and he said Mom, Amy is in the phone.  And I said Amy?  And he said yeah, Amy.  And I put the phone up to my ear and I'm saying hello and I can hear background music and background like shuffling of things but no one is at the phone.  So I just waited and then again I said hello, because I could hear somebody in the background moving and I could hear the music, I knew somebody was there though they didn't hang the phone up.  And I just kept saying hello, probably went on for a couple of minutes.  Then I hung the phone up, lifted it up and it didn't disconnect.  Finally it did disconnect and I put the phone down and my son is like

aren't you going to call her back.  I said what in the heck would she want me for at 11:30 at night.  Then I got thinking I know that her family is in Pennsylvania and maybe something happened to her, maybe something happened to her husband, I don't know.  I knew that she didn't have any family here.  And I called her back and the phone was picked up and then hung up and then picked up and then hung up a couple of times.  And I just kept thinking I don't understand why she would call me unless something was desperately wrong, so I tried again and she answered, I said did you call me, and she said yes.  Then she proceeded to start screaming at me, yelling at me, telling me that, you know, how dare you do what you did to me today and humiliate me in front of everyone and, you know, there are three Amys, one nice, one something and one you don't even want to see. One nice, one mean and one you don't even want to see.  No, one nice, one wild and one you don't even want to see or something like that.  And she scared me.  I said Amy, are you drunk, have you been drinking, did you take something.  And she started, you know, F this and F that and, you know, I was put in this job to get rid of you and they hired me specifically for this and that's what I'm going to do and how dare you do this to me.  And I was like do what, what do you want, what do you want me to say.  And she said – I said do you want me to say I'm sorry for sighing?  And I don't know if she ever said yes or no and she was telling me I had bought you a birthday present, the next day was my birthday, May 5th is my birthday, I bought you a birthday present, I haven't decided whether I'm going to give it to you or not.  I said let me make up your mind for you, don't five it to me because I don't want it.  I don't know why you're calling me yelling at me at 11:30 12 o'clock at night.  Meanwhile I'm walking around my house, I'm visibly shaking and my family is like what's going on, what is she saying to you and what is happening.  And I finally got her – she wouldn't let me go and I kept asking her what do you want, do you want me to not be your mentor anymore.  I was thinking in my mind there's no way I'm gong to sit next to this girl again and I couldn't, she scared me.  And anyway, she said no, I want you to still be my mentor.  We were planning on going to Salisbury I after that because she was all done learning Salisbury II, then she had to go learn the platform of Salisbury I.  She says no.  I want you to be there right beside me, going on

13

about how I was the best and she didn't want anybody that wasn't meticulous as me training her and that, she was just nuts that night and I would assume she was drinking or on something. And she scared the life out of me. (Wolfe Deposition, pages 195 – 198, Exhibit 2).

The next day, Ms. Wolfe called Mr. Parker and told him of the incident and said she was getting a restraining order to protect herself from Ms. Lenderking (Wolfe Deposition, pages 198 – 199, Exhibit 2). Mr. Parker told her he would come to Salisbury Monday morning, May 6, to meet with her and try to address the situation (Id.). (See, also, Parker Deposition, page 63, Exhibit 5). The next day, Ms. Wolfe in fact obtained a restraining order from the District Court for Wicomico County directing that Ms. Lenderking not threaten Ms. Wolfe, not contact her, and not visit her residence (see, copy of restraining order, attached as Exhibit 10). Upon arriving at the office May 6, at approximately 11:30 a.m., Ms. Wolfe gave Mr. Parker a copy of the restraining order, which he faxed to Mr. Lott (Wolfe Deposition, pages 207 – 208, Exhibit 2; see, also Parker Deposition, pages 70 – 72, 83, Exhibit 5). Mr. Parker meanwhile contacted Mr. Greene and Mr. Lott, who in turn spoke with Naser concerning how the matter was to be handled (Parker Deposition, pages 74 – 75, Exhibit 5). At their direction, he obtained statements from Ms. Wolfe and Ms. Lenderking, (Exhibits 11 and 10). Significantly, Ms. Lenderking's statement accords in most respects with Ms. Wolfe's:

"She asked why I was calling her so late and I told her I was upset and it consumed my time Friday night and Saturday with my husband. She asked me if I wanted someone else to train her and I said no that I had already told Dave Parker and Mike Greene I wanted her to train me because she is knowledgeable and meticulous. She asked me what I wanted and I said that I had said my peace and wanted to start over afresh with her on Monday morning. I said some other things which are personal about her personality. While some of these things I may not be proud of I said them out of anger and I feel that this entire issue is of a personal nature between the two of us. This was

14

done on my time not company time and at the time I thought it was the way to resolve my issues and feelings toward her." (Exhibit 10).

Apparently at the direction of Mr. Greene and Mr. Lott (and Ms. Naser?), Mr. Parker asked the three other technologists, Ms. Spahn, Ms. Byrd and Dawayne Mollock ("Mr. Mollock") to write up "their opinion of what had transpired [i.e. on Friday, May 3], as far as had there been any animosities there" (Parker Deposition, pages 76 – 77, Exhibit 5). Inexplicably, the three statements provided – i.e. from Ms. Spahn, Ms. Byrd and Mr. Mollock – say nothing about what "transpired" on Friday, May 3, nothing about Ms. Lenderking, and nothing about the relationship between Ms. Lenderking and Ms. Wolfe; instead, the three statements are devoted to a critique of Ms. Wolfe's "occasional lack of respect for others," (Byrd Statement, Exhibit 13), her "mood swings," (Mollock's Statement, Exhibit 14), and her "moods" (Spahn Statement, Exhibit 15).  Mr. Parker faxed these statements, along with Ms. Wolfe's and Ms. Lenderking's to Mssrs. Lott and Greene (Parker Deposition, pages 82 – 83, 93 – 94, Exhibit 5).  Although he conceded in his deposition he never really figured out what happened between Ms. Lenderking and Ms. Wolfe on Friday, May 3 (Parker Deposition, Page 98, Exhibit 5), Mr. Parker testified that he nonetheless decided to issue a written warning to Ms. Wolfe critiquing her for having "been very rude to [Amy Lenderking]" (Exhibit 16). However, when he communicated his decision to Mr. Greene and Mr. Lott, he was told "that there were circumstances that I was not completely aware of that would weigh on this" (Parker Deposition, page 101, Exhibit 5).  On May 7, Mr. Lott instructed him to fire Ms. Wolfe (Parker Deposition, page 110, Exhibit 5).  Mr. Lott told Mr. Parker the basis for the termination decision was her "failure to completely repay a debt to Med-Tel … disruption of the workplace for several reasons, phone calls, excessive phone calls, those kinds of things …" (Parker Deposition, page 111, Exhibit 5).  Shortly thereafter, Mr. Parker called Ms. Wolfe into his office and told her she was fired for "disruption of the workplace" (Wolfe Deposition, pages 217, Exhibit 2).  In Ms. Wolfe's unemployment case Med-Tel asserted she "was discharged by Med-Tel … because of alleged threats by co-workers to quit if the claimant remained employed" (Exhibit 17; see, also, Parker Deposition, page 105, Exhibit 5).  (The unemployment documents go on to identify Mr. Lott as the Company's "contact person".

15

(Exhibit 18)).  However, none of the statements provided by Mr. Mollock, Ms. Byrd or Ms. Spahn made such a threat and Mr. Parker testified in this deposition that they never otherwise threatened to quit if Ms. Wolfe wasn't fired (Parker Deposition, pages 105 – 107).  The termination notice asserted Ms. Wolfe was being fired for "disruptive influence on workforce" and "dishonesty or theft," defined as "abusing company phones and failing to repay Med-Tel for a loan" (Exhibit 19).  In Med-Tel's deposition, its corporate designee, Mr. Klein, however, testified that Ms. Wolfe's termination had "nothing to do with" Ms. Lenderking, asserting "that was … just sand block stuff" (Med-Tel Deposition, page 59, Exhibit 3).  Mr. Klein further testified that Ms. Wolfe had complied with the repayment terms regarding her loan (Id, pages 31 - 34, 61 – 62).

Ms. Wolfe then set about seeking reemployment, for which Mr. Mollock offered to serve as a reference (Wolfe Deposition, page 52, Exhibit 2).  When she quickly secured a job prospect her would be employer called Mr. Parker, who told him she "was a great tech and one for the job and to hire [her]" (Id., page 67).  She got the job.  Shortly thereafter, Mr. Lott called her at the new place of employment and tried to dissuade her from taking legal action (Id., page 219 - 220).

According to Med-Tel, Mr. Greene subsequently resigned after having been demoted because of his relationship with Ms. Byrd (Med-Tel Deposition, page 41, Exhibit 3; Defendant's Answers to Interrogatory, Answer Number 15, Exhibit 1).

## STANDARD OF REVIEW

In assessing a Motion for Summary Judgment, the Court must give the non-moving party the benefit of all allowable inferences.  United States v. Diebold, Inc., 369 US 654, 655 (1962) (per curiam), Moreno v. University of Maryland, 421 F Supp. 541 (D Md. 1976, aff'd without Op) 556 F 2nd 573 (4th Cir. 1977).  Federal Rule of Civil Procedure 56 should be cautiously invoked so that the parties may always be afforded a trial where there is a bone fide dispute of fact.  Associated Press v. U.S., 326 US 1 (1945).  A Summary Judgment motion will be granted only if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 US 317, 322 (1986).  The standards governing motions that seek to dispose of civil rights cases preliminarily or summarily are

particularly stringent:  in a civil rights case, "[the Court] must be especially solicitous of the wrongs alleged" and "must not dismiss the complaint unless it appears to a certainty that the Plaintiff would not be entitled to relief under any legal theory which my plausibly be suggested by the facts alleged."  <u>Harrison v. Untied States Postal Service</u>, 840 F 2d 1149, 1152 (4th Cir. 1998).  It is well settled that, in cases where material facts are largely undisputed, but the inferences to be drawn from them are disputed, Summary Judgment is inappropriate.  <u>Molinaro v. Watkins – Johnson,</u> 359 F Supp. 467 (D Md. 1973).  In any case in which motivation and intent are at issue, summary judgment will be denied.  <u>General Conference Corporation of Seventh Day Adventist v. Seventh Day Adventist Congressional Church</u>, 887 F 2d 228, 231 (9th Cir. 1989).  Thus, in a case in which discriminatory motivation is the central issue, Summary Judgment for the Defendant will be denied where such motivation can be inferred from the facts viewed in the light most favorable to the non-moving party.  <u>Lewis v. AT&T Technologies, Inc</u>., 691 F Supp 915 (D Md 1988).  Whether the workplace atmosphere is sufficiently pervaded by discriminatory factors, circumstance and <u>animus</u> is "quintessentially a question of fact."  <u>Amirmokori v. Baltimore Gas & Electric Co.</u>, 60 F. 3d 1126, 1131 (4the Cir 1995), citing <u>Beardsley v. Webb</u>, 30 F 3d 524, 530 (4th Cir 1994).  See, also, <u>Paroline v. Unisys Corp</u>, 879 F. 2d 100, 105 (4th Cir 1989).

## LEGAL ANALYSIS

## PLAINTIFF'S HOSTILE ENVIRONMENT/SEXUAL HARASSMENT CLAIM IS NOT TIME BARRED BECAUSE THE RECORD SUPPORTS CHARACTERIZATION OF IT AS CONTINUING VIOLATION.

In <u>National Railroad Passenger Corporation v. Morgan</u>, 122 S. Ct. 2061 (S. Ct. 2002), (usually cited as "<u>AmTrak</u>," Petitioner's trade name), the Supreme Court gave contemporary articulation to the longstanding "continuing violation" doctrine.  In <u>Amtrak</u>,  the Complainant had filed an EEOC charge contending his employer, AmTrak, had subjected him to discrete adverse personnel actions which he characterized as "discriminatory and retaliatory," and further contended he had experienced a "racially hostile work environment" throughout his employment.  Id., at 122 S. Ct. 2068-2069.  The timing of the charge was such that, "while some of the allegedly discriminatory acts about which [Complainant] complained occurred

17

within three hundred days of the time that he filed his charge with the EEOC, many took place prior to that time period." (Id.)  Following a somewhat checkered procedural history, the case found its way to the Supreme Court for determination of the extent to which Complainants claims were time barred.  The Supreme Court ruled:

> "We conclude that a Title VII Plaintiff raising claims of discrete discriminatory or retaliatory acts must file his charge within … three hundred days … A charge alleging a hostile work environment claim, however, will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and as least one act falls within the time period." (Id., 122 S. Ct. 2077).

In reaching its holding, the Court offered this discussion of "hostile environment" claims:

> "Hostile environment claims are different in kind from discrete acts.  Their very nature involves repeated conduct … 'The repeated nature of the harassment or its intensity constitutes evidence that management knew or should have known of its existance' [citing, with approval 1B. Lindemann & P. Grossman, employment discrimination law 348-349 (3d ed. 1996)] … The 'unlawful employment  practice' therefore cannot be said to occur on any particular date, it occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own … Such claims are based on the cumulative effect of individual acts.  Thus, '[w]hen the workplace is permeated  with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated [citing Harris v. Forklift Systems, Inc., 114 S. Ct. 367 (1993)] … In determining whether an actionable hostile work environment claim exists, we look to 'all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the employee's work

18

performance' [citing <u>Harris</u>, at  114 S. Ct. 367] … Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered  by a court for the purposes of determining liability … Our conclusion with respect to the incidents that may be considered for the purposes of liability is reinforced by the fact that the statute in no way bars a Plaintiff from recovering damages for that portion of the hostile environment that falls outside the period  for filing a timely charge." (122 S. Ct. 2073 – 2075).

The Fourth Circuit first applied the continuing violation doctrine in a racial harassment case, <u>Williams v. Norfolk & W</u>, 530 F 2d 539 (4th Cir. 1975).  The next case in which the Fourth Circuit applied the doctrine was a gender discrimination case brought under Title VII and the Equal Pay Act, 29 USC §255(a), <u>Jenkins v. Home Insurance Co.</u>, 635 F 2d 310 (4th Cir. 1980).  There, the Court held:

"We view the continuing violation issue to be the same in sex cases as in race cases and we will apply the same rules, regardless of the type of discrimination alleged." (Id., 635 F 2d 312).

The "continuing violation" doctrine has been applied in cases involving both serial violations, predicated on a series of related discriminatory acts against a given person, and systemic violations, predicated on the employer's having maintained a discriminatory system or pattern as to one or more employment practices.  See, <u>Bazemore v. Friday</u>, 470 US 385 (1985), <u>Jensen v. Frank</u>, 912 F 2d 517, 522 (1st Cir 1990) and <u>Williams V. Norfolk & W</u>, <u>Supra</u>.  See, also, <u>Beall v. Abbott Laboratories</u>, 130 F 2d 614, 620 (4th Cir 1997).

In this case, Plaintiff alleges that Defendant's on site supervisor, Mr. Barnes, and his boss, Mr. Greene, maintained an unwelcome, sexually offensive workplace environment that included outrageous vulgarities and sexual propositions, maintenance of inappropriate sexual images, and a routine of sexual banter about women, their bodies and their availability for sex. Ms. Wolfe complained to Mr. Greene without success and only was able to procure relief when an off-site supervisor intervened.  It is undisputed Ms. Wolfe's complaint brought about Mr. Barnes' termination and Mr. Greene's reprimand.  According to Ms. Wolfe's

19

uncontradicted testimony, Mr. Greene not only continued his environmental sexual harassment, maintaining sexual imagery, jokes and the like in the workplace, but launched an unrelenting campaign of ostracism, a variable "shunning" directed at her.  Ms. Wolfe testifies (again without contradiction) that, when she attempted to make peace with Mr. Greene, he told her he would never forgive her and would never speak to her again.  It is further undisputed that his ostracism, his refusal to speak to her and his predilection for making nasty, supposedly facetious comments about her continued without interruption until her termination. Auspiciously, Mr. Greene was involved in her promotion denial, personally conducted the telephone "investigation" which - according to one of the many explanations given by Defendant – brought about her termination, and participated actively in her termination decision.

Certainly, the conduct directed against Ms. Wolfe was outrageous, unwelcome, severe, and pervasive.  See, Paroline v. Unisys Corp, Supra, at 879 F 2d 105.  As the Fourth Circuit has observed, the "line between a merely unpleasant working environment … and a hostile or deeply repugnant one may be difficult to discern."  Hopkins v. Baltimore Gas & Electric Co, 77 F 3d 745, 753 (4th Cir 1996).   There is no precise test for determining whether a work environment is sufficiently hostile to support a hostile environment harassment claim, and the Fourth Circuit has ruled that the trier of fact is to evaluate the "totality of the circumstance, including the frequency of the discriminatory conduct; its severity; whether it's physically threatening or humiliating, or a merely offensive utterance; and whether it unreasonably interferes with an employees work performance"  Karim v. Staples, Inc., 210 F Supp 2d 737, 752 (D Md 2002). See, also, Settle v. Baltimore County, 34 F Supp 2d 969, 993 (D Md 1999). The nature of the applicable standards thus makes summary judgment inappropriate in many harassment cases.  In this case, certainly a reasonable person could find that Ms. Wolfe's work environment harbored "discriminatory intimidation, ridicule and insult," Meritor Savings Bank v. Vinson, 477 US 57, 63 – 68 (S. Ct. 1986).  Mr. Greene's mistreatment of her certainly interfered with her workplace performance, at least to the extent of making her job significantly more difficult, since it was necessary for her to interact with him throughout her career in the Salisbury location.  Thus, Ms. Wolfe's claims are sufficient to raise a triable issue of fact as to whether they constitute sexual harassment of the hostile environment variety.

The Record also supports Ms. Wolfe's contention that her harassment has been a "continuing violation."  According to her version of the facts, (which at this stage must be taken as true – though, significantly – many of her actual contentions are undisputed), her supervisors subjected her to a remarkably consistent, concerted pattern of sexually charged mistreatment and retaliation.  According to Plaintiff's testimony, she was ostracized for her complaints, but clearly viewed as a sexually "available" employee subject to advances such as those made by Mr. Coleman.  Since Ms. Wolfe's testimony establishes that the campaign of harassment directed against her continued virtually until the time of her termination, and well within three hundred (300) days before filing her EEOC charge, she has adequately supported a triable cause of action for hostile environment/sexual harassment, and has preserved her claim from untimeliness objections under the "continuing violation" doctrine.

**PLAINTIFF'S RETALIATION CLAIM BASED UPON HER TERMINATION SHOULD NOT BE DISMISSED BECAUSE THE RECORD VIEWED IN THE LIGHT MOST FAVORABLE TO PLAINTIFF ALLOWS THE TRIER OF FACT TO INFER HER TERMINATION WAS SUBSTNATIALLY MOTIVATED BY A RELIATORY ANIMUS.**

Med-Tel asserts Ms. Wolfe's attack upon her termination as retaliatory must fail as a matter of law.  Med-Tel contends the evidence fails to support the finding of any retaliatory animus, on the one hand and adequately supports Med-Tel's contention she was fired for a legitimate, non-discriminatory reason, on the other.  Med-Tel is wrong on both counts.

According to Ms. Wolfe's unrebutted testimony, Mr. Greene was her eminence grise, her nemesis:  In Wolfe's uncontradicted account, Mr. Greene not only continued his harassing conduct following his reprimand, (which was prompted by Ms. Wolfe's complaint), but explicitly declared his hatred for Ms. Wolfe and his intention of ostracizing her.  Med-Tel has offered no evidence to rebut Ms. Wolfe's detailed testimony that he carried out his threat by refusing to speak to her, directing communications to her through his girlfriend, Ms. Byrd, and subjecting her to derogatory and deprecating statements.  It is undisputed Mr. Greene was personally involved in the promotional process that resulted in Ms. Wolfe's failure to get a promotion, in the telephone investigation that ostensibly lead to her termination, and in the decision making process with regard to the termination itself; one of the three employee

21

statements produced to justify Ms. Wolfe's termination was signed by Mr. Greene's girlfriend, Ms. Byrd.

A sinister twist is given to the evidence against Med-Tel by Mr. Coleman's alleged misconduct. The accounts given by Mr. Coleman and Ms. Wolfe with regard to their Christmas party encounter agree that Mr. Coleman made explicit references to the Mike Barnes incident, made facetious references to Ms. Wolfe "wearing a wire" or tape recording their conversation, took her to his car to listen to an Enya CD and then kissed her. Although Mr. Coleman and Ms. Wolfe disagree as to who initiated the process, Mr. Coleman concedes this, skeletal account of the encounter. Both Mr. Coleman and Ms. Wolfe assert that the Chief Regional Technologist promotion came up for discussion, though each attributes the initiative to the other. In any event, on Ms. Wolfe's account, (which must be taken as true at this stage), Mr. Coleman engaged in harassing misconduct by making an overt <u>quid</u> <u>pro quo</u> advance. That Ms. Wolfe rebuffed Mr. Coleman's advance made her an obvious target; since, as he put it during their bar room conversation, he had the power to give her any job she wanted, he also by clear implication had the power to deprive her of any advancement, promotion or job security. Mr. Coleman had both the opportunity and the inclination to retaliate against Ms. Wolfe; although, unlike Mr. Greene, he is not directly tied to the decisions denying her a promotion and firing her, his misbehavior bolsters the credibility of her retaliation claim.

Certainly, viewing the Record in the light most favorable to Ms. Wolfe, the trier of fact could infer her firing was retaliatory. As for Defendant's contention she was fired for a legitimate, non-discriminatory reason, the question in the first instance is: Which legitimate, non-discriminatory reason? Defendants have advanced several, most demonstrably false.

The reason given by Med-Tel for Ms. Wolfe's termination during her unemployment proceeding was that she was fired because her co-workers all threatened to quit unless she were terminated. However, none of the statements submitted by her co-workers made such an assertion, and Mr. Parker testified that none of them ever said any such thing. Thus, that "legitimate, non-discriminatory reason" is false.

Another legitimate, non-discriminatory reason advanced by Med-Tel for firing Ms. Wolfe was that she had failed to repay a loan; this assertion was made in her written termination notice, in the reasons given by Mr. Parker (given to him by Mssr. Lott and

22

Greene) during Ms. Wolfe's termination conference, and otherwise.  However, Med-Tel's own corporate designee, Mr. Klein, testified that she had kept current under an arrangement by which she was subject to a fifty dollar ($50.00) a week payroll deduction, and Med-Tel has marshaled no evidence to rebut Ms. Wolfe's testimony that she had never defaulted under that arrangement.  Accordingly, that "legitimate, non-discriminatory reason" is demonstrably false.

Clearly, the event which served as the occasion for Ms. Wolfe's termination was her run in with Ms. Lenderking.  And, clearly, it was this "run in" that Mr. Parker reference in terminating her for "workplace disruption."  But here, again, the Record simply does not support any conclusion that this was the reason for Ms. Wolfe was fired:  Defendant's corporate designee, Mr. Klein flatly asserted the Lenderking incident had nothing to do with Ms. Wolfe's termination, dismissing it as "just sand block stuff" (Med-Tel Deposition, page 59, Exhibit 3).  Certainly, it beggars belief to suppose Ms. Wolfe was really fired because, on dragging herself from her sick bed to come into the office, she rolled her eyes at a co-worker's Elvis impersonation.  It is equally incredible to suppose Ms. Wolfe was really fired because she had the audacity to complain when a co-worker called her at home at 11:30 on a Saturday night and subjected her to a harangue sufficiently threatening to justify issuance of a restraining order.  The three co-worker's statements recruited by Mr. Parker to justify Ms. Wolfe's termination, one from Mr. Greene's girlfriend, the second from an employee who volunteered to provide Ms. Wolfe a favorable reference, and the third from an employee who herself had been recently involved in a shouting match with Ms. Lenderking, are palpably unreliable, and Med-Tel's reliance upon them significantly undermines its bona fides.  Thus, yet another "legitimate, non-discriminatory reason" proffered by Med-Tel must be discounted as simply untrue.

The last of the litany of reasons alternatively advanced by Med-Tel to justify Ms. Wolfe's termination is that she had abused company telephone privileges.  It is ironic that the "investigation" of Ms. Wolfe's alleged telephone abuse was conducted by her nemesis, Mr. Greene, who, according to the deposition testimony of a co-worker, Ms. Marshall, Mr. Greene used company telephones to carry on an affair with Ms. Byrd.  In her deposition, Ms. Wolfe testified in detail concerning her co-workers' wide spread use of company telephones for personal, long distance calls.  She testified from personal observation that Mr. Greene's

23

girlfriend, Ms. Byrd, spent as must time making long distance calls on the company telephone as she did, that another technologist who called her mother in Florida several times a day probably spent more time then Ms. Wolfe did making personal long distance calls on the company phone, that another technologist made frequent calls to a boyfriend in Western Maryland, and that yet another technologist devoted days at a time to intensive personally telephone calling preparing for a real estate settlement (Wolfe Deposition, pages 129 – 137, Exhibit 2).  On the only occasion when it is undisputed Ms. Naser (or anyone else with the Company) spoke to Ms. Wolfe about the telephone abuse, it was brought up in the context of a general discussion of how Ms. Wolfe should stop attributing her failure to get a promotion to "the Barnes incident" and needed to work on finding ways to "get along with men."  It is undisputed that no disciplinary action was ever taken against Ms. Wolfe concerning her telephone practices, undisputed that her supervisor, Mr. Parker, never counseled her about it, and undisputed that her offer to reimburse the Company for her long distance telephone call usage was rejected.  Med-Tel has adduced no evidence to explain why Ms. Wolfe, of all the Med-Tel employees "abusing" the Company telephone, was suddenly singled out for punishment, and the proverbial bottom line is that the telephone abuse theory, like all the others advanced by Med-Tel, is a pretext.

Thus, there is abundant evidence in the Record from which the trier of fact could conclude that Ms. Wolfe was fired in retaliation for her complaining about and resisting sexual harassment, and that the supposedly non-discriminatory theory advanced by Med-Tel to justify her termination was merely a pretext.

## SUMMARY

Plaintiff's hostile environment/sexual harassment claim is not time barred because the Record supports characterization of it as a continuing violation.  Plaintiff's retaliation claim based upon her termination should not be dismissed because the Record, viewed in the light most favorable to Plaintiff, allows the trier of fact to infer her termination was substantially motivated by a retaliatory animus.

## <u>CONCLUSION</u>

Wherefore, it is respectfully requested this Honorable Court deny Defendant's Motion for Summary Judgment and grant Plaintiff such other and further relief as the nature of her cause may warrant.

_____/s/_____

Robin R. Cockey, Federal Bar No. 02657
Cockey, Brennan & Maloney, P.A.
313 Lemmon Hill Lane
Salisbury, Maryland  21801
Telephone: 410-546-1750
Attorney for Plaintiff
