IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PATRICE WOLFE                          :
                                       :
        v.                             :        CIVIL NO. L-02-3965
                                       :
MED-TEL INTERNATIONAL                  :
CORPORATION                            :

## MEMORANDUM

Pending in this employment discrimination lawsuit is Defendant's Motion for Summary

Judgment. Because the parties have fully briefed the issues, no oral argument is necessary. See Local

Rule 105.6 (D. Md. 2004). For the reasons stated below, the Court will, by separate Order, GRANT

Defendant's motion and DIRECT the Clerk to CLOSE the case.

### I.      Summary

Med-Tel International Corporation ("Med-Tel"), which is headquartered in McLean, Virginia,

owns and operates some seventeen radiology and MRI facilities in the United States.[1] In 1997, Med-

Tel hired Plaintiff, Patrice Wolfe ("Wolfe"), as an MRI technologist at its Toledo, Ohio site. A

technologist's primary responsibility is to place the patient inside the scanner and produce the diagnostic

films that are later "read" by a radiologist. Each facility also employs other staff, including scheduling

coordinators, a marketing representative, and an insurance coordinator.

In the winter of 1999-2000, Med-Tel transferred Wolfe to its Salisbury, Maryland facility.[2]

---

[1] Med-Tel also operates facilities in the United Kingdom.

[2] Med-Tel claims that while employed at the Toledo facility, Wolfe was having an extra-marital
affair that was interfering with her job performance. Specifically, she was cancelling and rescheduling



EXHIBIT

A

Her direct supervisor was Michael Barnes, the Regional Chief Technologist.[3]  Barnes reported to

Michael Greene, the Manager of Clinical Operations.[4]

On May 7, 2002, Med-Tel terminated Wolfe.  On June 19, 2002, Wolfe filed a Charge of

Discrimination with the Equal Employment Opportunity Commission ("EEOC").  After the agency

dismissed her claim and issued a Notice of Right to Sue, Wolfe filed the instant suit.

Wolfe alleges two counts of employment discrimination in violation of Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"): sexual harassment (Count I)

and retaliation (Count II).  Specifically, she asserts the following grievances against the company and

her supervisors:

    (i)      supervisors Barnes and Greene sexually harassed Wolfe and other female employees by creating a "boys' club" atmosphere at the Salisbury facility;

    (ii)     Ron Coleman, the owner and Chief Executive Officer of Med-Tel, made improper sexual advances towards Wolfe at a company retreat;

    (iii)    the company failed to promote Wolfe, and this failure was in retaliation for Wolfe's complaints about Barnes and Greene and for her rebuff of Coleman's sexual advances;

    (iv)    after Wolfe complained to management about Greene, he retaliated against her by creating a hostile work environment; and

---

patient appointments so that she could spend time with her boyfriend. The company, therefore, transferred Wolfe to Maryland to give her a fresh start.  Wolfe disputes this asserted reason for the transfer.  The Court need not resolve this dispute, however, because Wolfe's transfer is not at issue in this case.

[3] Barnes supervised technologists at Med-Tel's facilities in Maryland, Delaware, and Pennsylvania.

[4] The record indicates that Greene was based in Salisbury, but that he had supervisory responsibility for all of Med-Tel's domestic sites.  Greene reported to R. Craig Platenberg, M.D., the Executive Vice President for Medical Operations.

     (v)    the company further retaliated against Wolfe by terminating her.

Not all workplace slights, frictions, and injustices are actionable. To determine which of Wolfe's claims are actionable, the Court must measure Wolfe's allegations against the following legal tests: (i) under the applicable statute of limitations, Wolfe was required to file her administrative claim within 300 days of the date on which the alleged discrimination ended; (ii) workplace harassment amounts to an "adverse employment action" only if "there is evidence of conduct severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive;"[5] and (iii) to prove retaliation, Wolfe must establish a causal connection between the protected activity (complaining of discrimination) and the adverse employment action.

Med-Tel has moved for summary judgment. The Court has measured Wolfe's allegations against the prescribed tests and concludes that they are insufficient. First, Wolfe's sexual harassment claims are time barred. The "boys' club" era ended in October 2000 when Med-Tel fired Barnes and reprimanded Greene. Wolfe did not file her EEOC charge until June 19, 2002, more than 300 days later. The retreat at which Coleman allegedly propositioned Wolfe occurred in December 2000, more than a year before Wolfe filed her charge.

Wolfe argues that her sexual harassment claims are saved by the "continuing violation" doctrine. For that doctrine to apply, however, at least one act of sexual harassment must have occurred within the 300 days preceding the June 19, 2002 filing of her charge. Wolfe has not produced evidence of any act of sexual harassment during that time frame.

---

[5] Von Gunten v. Maryland, 243 F.3d 858, 869-70 (4th Cir. 2001) (internal quotations omitted).

3

Second, Wolfe's "failure to promote" claim is also time barred. The company turned down her promotion request in January 2001, more than a year before Wolfe filed her charge with the EEOC.

Third, Wolfe complains that Greene gave her the "cold shoulder" after Barnes was fired and he was reprimanded. Greene's distant, reserved attitude made Wolfe uncomfortable, but it did not impair her ability to perform her job. Receiving the "cold shoulder" at work may be unpleasant, but it is not actionable under Title VII.

Finally, Wolfe cannot establish a causal connection between her complaints of sexual harassment and her termination. Med-Tel fired Wolfe approximately 19 months after she complained about the alleged boys' club harassment and 17 months after she rebuffed Coleman's alleged sexual advances. A long lapse of time between her protected activity and her termination negates any inference of a causal connection. Med-Tel terminated Wolfe on the grounds that she was a disruptive presence at work and that she had abused the company's 1-800 number by receiving long, personal telephone calls from a man in Ohio with whom she was involved. The company substantiated these claims, and Wolfe failed to produce evidence from which a reasonably minded jury could find that the stated reasons were pretextual.

For these reasons, which are discussed more fully herein, Wolfe's claims fail and Med-Tel is entitled to summary judgment.

II.    **Factual Overview**

The Court now turns its attention to the basic facts underlying Wolfe's grievances.

A.    **Late 1999-2000: "Boys' Club" Atmosphere**

4

It is evident that Barnes and Greene[6] acted boorishly at work. Wolfe does not contend that either man propositioned her or touched her in a sexual or offensive manner. She does contend, however, that (i) both Barnes and Greene told dirty jokes and made vulgar sexual comments; (ii) Barnes sexually propositioned other female employees and, on one occasion, implied that Wolfe had engaged in sexual relations with him; and (iii) Greene showed Wolfe pictures of naked men on his computer screen and shared pornographic jokes with others via the office e-mail system. (Pl. Ex. 2, at 85-87; Pl. Ex. 7.)

In August 2000, Wolfe complained to Greene. (Pl. Ex. 2, at 93.) Although Greene stated that he would discuss Wolfe's concerns with Barnes, the situation did not improve. (Id. at 240.) Another employee independently reported the harassment to Med-Tel's human resources department, which promptly investigated. As part of the investigation, human resources personnel met with Wolfe, who described Barnes's and Greene's lewd behavior. (Id. at 93-100.) Med-Tel reprimanded Greene and offered Barnes two choices: resign or be fired. Barnes resigned in October 2000. (Def. Ex. 27, at 19.)

## B.    Greene's Alleged Sexual Harassment after Barnes's Resignation

In opposing Med-Tel's summary judgment motion, Wolfe states in conclusory terms that Greene's sexually boorish behavior persisted afer Barnes was terminated. Specifically, Wolfe claims that Greene's "sexually harassing conduct - use of a pornographic computer screen saver, and office discussion of pornographic email jokes - continued." (Pl. Aff. ¶ 2.) Wolfe makes no effort to support this contention with examples. Moreover, her allegation is flatly contradicted by her own deposition

---

[6] It appears from the record that, although their jobs required them to travel to various Med-Tel sites, Barnes and Greene were at the Salisbury facility on a regular basis.

5

testimony and by other parts of her affidavit.

On deposition, Wolfe testified that she last saw pornographic material on Greene's computer in October 2000, when Barnes was fired.[7] Wolfe explained in her affidavit that Greene refused to speak to her after October, and she, therefore, no longer heard him making any sexually explicit comments. (Id.) She also offers no evidence that Greene made harassing remarks to other employees after Barnes's termination.

### C.    Greene's Ostracism

Wolfe claims that, from October 2000 until her termination in May 2002, Greene ostracized her by (i) making deprecating and patronizing comments about her work performance; and (ii) refusing to speak to her. During discovery, Wolfe failed to support her allegation regarding the deprecating and patronizing comments. She could cite to only one example, that he made fun of her during a lecture that she was giving to other technologists. (Pl. Aff. ¶ 4.) She does not explain what Greene said, nor does she contend that his comments were humiliating or threatening.

Wolfe broadly alleges that Greene's silent treatment[8] made it difficult for her to perform her job because she relied upon Greene for information about changes in office protocol.[9] She offers no

---

[7] "Q: When was the last time you saw a pornographic joke on Mr. Greene's computer? A: Well, probably after Mike Barnes was terminated slash resigned, Mike Greene didn't talk to me after that, so it would have had to have been September of 2000 or October of 2000." (Pl. Ex. 2, at 88.)

[8] When Wolfe approached Greene about this silent treatment, he stated that he would never forgive her for complaining to management about him. (Pl. Ex. 2, at 107-08.)

[9] (See Pl. Aff. ¶ 3 (stating that Greene's refusal to communicate with her "was extremely awkward and problematic in the workplace, because I had many professional occasions upon which it was necessary for me to communicate effectively with Mr. Green[e]" and that Greene's "engrained, obstructive behavior in this regard fortunately never resulted in a patient being put at risk, but made it

6

example of any change that was not relayed to her, however. (Pl. Ex. 2, at 102-05.)  Wolfe also

broadly contends that she was singled out for this silent treatment, but when pressed for specifics she

admitted that the only technologist to whom Greene passed information was Christine Byrd. (Id. at

110-11.)  The record reflects that Greene was involved in an intimate relationship with Byrd, and that

Med-Tel eventually demoted Greene to a technologist position and transferred him away from the

Salisbury facility because of this relationship.  Moreover, Greene was only Wolfe's direct supervisor

from Barnes's termination in October 2000 until Parker's promotion in January 2001.  Wolfe admits

that she and Parker communicated freely about company matters.  Finally, Wolfe admitted during her

deposition that there was never a situation in which she improperly performed her job because Greene

had refused to communicate with her. (Id. at 112.)

Other than Greene's silence, Wolfe offers no evidence of other forms of ostracism.  While

acknowledging that her co-workers were generally cordial, Wolfe claims that they lost respect for her

when Greene began giving her the silent treatment. (Id. at 244-47.)  She has produced no evidence,

however, that Greene encouraged or "signaled" other employees to treat her any differently.  In

addition, Wolfe admits that this situation affected her happiness rather than her work performance. (Id.

at 246.)  Also, Wolfe does not contend that any other aspects of her employment (such as her job

assignments, parking privileges, hours, or office location) were altered.[10]

---

needlessly difficult for me (and others working with me) to do the job that needed to be done").)

    [10] Although Wolfe complains that Greene held her to an "extremely exacting schedule,"
requiring her to "punch a time clock coming and leaving," she admits that other employees also had to
log their hours and states that she was never disciplined for failing to keep her scheduled hours. (Def.
Ex. 3, Answer 2; Def. Ex. 24, at 259-61.)

**D.    Fall 2000 - 2001: Ron Coleman and the Regional Chief Technologist Position**

### 1.    Wolfe Applies for the Regional Chief Technologist Position

In Fall 2000, Med-Tel informed employees that it was seeking candidates to fill the Regional Chief Technologist position that Barnes had vacated. (Id. at 154-55; Def. Ex. 27, at 43.) Wolfe and David Parker ("Parker"), a technologist at the Dover, Delaware site, were the only two applicants.[11] (Pl. Ex. 2, at 156; Pl. Ex. 3, at 44.)

### 2.    Encounter Between Wolfe and Coleman

In December 2000, Wolfe attended a company dinner meeting. Ron Coleman, Med-Tel's Chief Executive Officer, was in attendance. Wolfe claims that during the social hour Coleman briefly mentioned her candidacy for the Regional Chief Technologist position. He then abruptly changed the subject to his unsatisfactory sex life, propositioned her, and tried to kiss her. Wolfe states that she rejected Coleman's advances. (Pl. Ex. 2, at 148-53.)

Coleman paints a different picture. In his deposition, Coleman states that Wolfe complained about her own unsatisfactory sex life and suggested that he accompany her to her room, an invitation that he declined. (Def. Ex. 25, at 42-44.)

Wherever the truth lies, this was Wolfe's only incident involving Coleman. Even accepting Wolfe's version, she does not contend that Coleman was angry or upset at having been rebuffed. Despite a full opportunity for discovery, there is no evidence in the record that Coleman exerted any

---

[11]  Wolfe claims that when she submitted her application to Greene, he "barely acknowledged" it. When Parker applied, however, Greene "spent more than an hour closeted in the office with Mr. Parker, presumably discussing the application process." (Pl. Aff. ¶ 6.)

influence on decisions affecting her career.

### 3.    Wolfe is Denied Promotion

In early January 2001, a three-member panel[12] interviewed Wolfe and Parker for the Regional Chief Technologist position. Wolfe claims that during her interview the panel did not discuss anything of substance. (Pl. Ex. 2, at 126.)

All three panel members rated Parker more highly than Wolfe and, therefore, selected Parker for the position. (Def. Ex. 1, ¶¶ 5, 6; Def. Exs. 9A-F.) In mid-January 2001, Lott, one of the panel members, advised Wolfe that the panel had chosen Parker. (Pl. Ex. 2, at 175-76.) As the new Regional Chief Technologist, Parker became Wolfe's direct supervisor.

### 4.    Wolfe Alleges Retaliation

Wolfe felt that she was more qualified than Parker and speculated that she had been passed over in retaliation for her participation in the investigation of Barnes and Greene and her rejection of Coleman's advances. (Id. at 113-19; 143-44.) The record contains no evidence to support these contentions, however.

There is no evidence that Coleman or Greene participated in the promotion decision. Lott submitted an uncontroverted affidavit describing the selection. (Def. Ex. 1.) Lott states that the panel rated Parker and Wolfe on seven subject areas. Although the candidates were close, the panel scored Parker higher and unanimously agreed to offer him the position. (Id., ¶¶ 5- 6.) Lott's affidavit is

---

[12]  The three members of the panel were: (i) Craig Platenberg, M.D., Med-Tel's Executive Vice President for Medical Operations; (ii) Lawrence Yao, M.D., a musculoskeletal radiologist; and (iii) Charles Lott, a human resources officer. (Def. Ex. 1, ¶ 4.)

supported by the panel's contemporaneous rating sheets, which were placed in evidence. (Def. Exs. 9A-F.) Wolfe offers no evidence to cast doubt on Lott's affidavit.

In January 2001, Rebecca Naser ("Naser") of human resources met with Wolfe and assured her that her failure to receive the promotion had nothing to do with retaliation. Naser told Wolfe that she did not get the position because she had less job knowledge than Parker. (Pl. Ex. 2, at 125-26.)

### E.    Spring 2002: Events Leading to Wolfe's Termination

#### 1.    Telephone Abuse

In April 2002, Charles Lott was investigating Med-Tel's high telephone bills. (Def. Ex. 1, ¶¶ 8-9.) Med-Tel has a 1-800 number, meaning that long-distance calls are free to the caller but charged to the company. (Id., ¶ 16.) While reviewing the bills, Lott noticed that there were a large number of lengthy calls being placed to the Salisbury facility from an Ohio phone number. Upon further inquiry, Lott discovered that the calls were being placed to Wolfe by a man named Carlos, with whom Wolfe was having an affair.[13] (Id., ¶ 11.) Wolfe does not dispute that she accepted these calls during working hours. (Def. Ex. 24, at 30-32, 43-45.)

Lott also learned that Wolfe had previously been reprimanded for using the company's telephones to communicate with Carlos. (Def. Ex. 1, ¶ 12.) Specifically, in January 2001, Naser from human resources had warned Wolfe that her calls to Carlos on company time must cease.[14] (Def. Ex. 11, ¶¶ 10-11.)

---

[13] Wolfe admits that while employed by Med-Tel, she was involved with a man named Carlos. (Def. Ex. 24, at 30.)

[14] Wolfe did not deny placing long-distance calls on the company phone and offered to reimburse Med-Tel. (Pl. Ex. 2, at 128-29.)

10

### 2.    Interpersonal Problems Between Wolfe and Co-Workers

In early May 2002, Wolfe had an acrimonious dispute with co-worker Amy Lenderking ("Lenderking"). Earlier that year, Med-Tel had hired Lenderking as a technologist and assigned Wolfe as her mentor. (Id. at 181-82.) The two did not get along. Wolfe considered Lenderking's behavior to be erratic, describing her as "bounc[ing] off the walls." (Id. at 184-85.)

On Friday May 3, 2002, Wolfe overheard Lenderking impersonating Elvis Presley. (Def. Ex. 24, at 192.) Wolfe, who was not feeling well, sighed and rolled her eyes. (Id.) Lenderking, upset about Wolfe's reaction, called Wolfe at home around 11:30 p.m. the following evening. Before Wolfe could pick up, Lenderking decided not to press the issue and hung up. Wolfe, however, had seen Lenderking's phone number on caller ID and returned the call. Wolfe and Lenderking provide contrasting descriptions about the ensuing conversation. Wolfe contends that Lenderking was abusive and threatening. Lenderking describes no threats, but does concede that she was angry and may have made remarks she regrets. (Def. Exs. 17, 18.)

The next day (Sunday, May 5th), Wolfe called Parker at home and recounted the phone conversation. (Pl. Ex. 2, at 199.) Describing Lenderking's behavior as frightening, Wolfe said that she intended to seek a restraining order. (Id.) Parker responded that he would discuss the matter with Wolfe the following day. (Id. at 200.)

The next morning (Monday, May 6th), Wolfe obtained a restraining order before coming to work. Upon arriving at the office, she showed the order to Parker. (Id. at 202-05, 207-08.) Parker, unsure how to handle the situation, called his supervisor, Greene. Greene, in turn, contacted Lott in human resources. (Def. Ex. 26, at 74; Def. Ex. 1, ¶ 13.)

11

Lott took control of the situation. He interviewed Parker, who revealed that other Salisbury MRI technicians had complained about Wolfe, stating that she brought personal problems to the office and created an unpleasant work environment. (Def. Ex. 1, ¶ 13; Def. Ex. 26, at 98, 105.) Parker advised Lott that he had requested Wolfe and Lenderking to prepare written statements. (Def. Ex. 1, ¶ 14.) Lott suggested that Parker also obtain written statements from the other three Salisbury technologists: Christine Byrd, Robin Spahn, and Dawayne Molock. (Id.; Def. Ex. 26, at 76-77.) Parker complied and forwarded the statements to Lott. (Def. Ex. 1, ¶ 18.)

In their statements, all three technologists complained of Wolfe's "lack of respect for others," "willingness to belittle new employees," confrontational and negative attitude, and moody disposition. (Def. Exs. 19-21.) One of them expressed concern that Wolfe's behavior might cause other technologists to quit. (Def. Ex. 19.)

### F.    May 7, 2002: Med-Tel Terminates Wolfe

On May 7th, Med-Tel headquarters conferred and made the decision to terminate Wolfe.[15] After phoning Parker with instructions to carry out the termination, Lott sent Parker an e-mail specifying the grounds: (i) abuse of company telephones, (ii) failure to repay Med-Tel for a no-interest loan,[16] and

---

[15] The decision was made at headquarters. As is discussed in Lott's affidavit, he conferred with other personnel (including Dr. Platenberg, Greene, and Robert Klein, Med-Tel's Executive Vice President for Law) regarding what disciplinary action to take. (Def. Ex. 1, ¶ 15.) Lott then describes that Wolfe's telephone abuse and disruption of the workplace "led us to decide that Patrice Wolfe's employment should be terminated." (Id., ¶¶ 15-17.)

[16] When Wolfe moved to Maryland, Med-Tel loaned her $5,000, without interest. The January 4, 2000 promissory note states that Wolfe shall repay the principal "from the proceeds of the settlement of" her home in Toledo or, if the settlement did not occur within six months, in installments as agreed to by Wolfe and Med-Tel. (Def. Ex. 28.) As of May 2002, the loan was almost two years past due. The parties disagree whether the delinquency was the fault of the company for failing to make

12

(iii) disruption of the workplace through her demeaning conduct towards co-workers. (Id., ¶¶ 17-18;

Def. Ex. 22.) Parker carried out Lott's orders. (Def. Ex. 26, at 112-13.)

## III.    Standard for Summary Judgment

The Court may grant summary judgment when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine

issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); see also Felty v. Graves-

Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (recognizing that trial judges have "an

affirmative obligation" to prevent factually unsupported claims and defenses from proceeding to trial).

Nevertheless, in determining whether there is a genuine issue of material fact, the Court must view the

facts, and all reasonable inferences to be drawn from them, in the light most favorable to the non-

moving party. Pulliam Inv. Co. v. Cameo Properties, 810 F.2d 1282, 1286 (4th Cir. 1987).

## IV.    Analysis

With the factual background in mind, the Court now turns its attention to analyzing Wolfe's

various grievances.

### A.    Count I - Sexual Harassment

Under Title VII, Wolfe was required to file her EEOC charge within 300 days after the alleged

acts of harassment. See 42 U.S.C. § 2000e-5(e)(1). Wolfe filed her EEOC charge on June 19,

---

the necessary monthly payroll deductions, or whether Wolfe was intentionally ignoring her repayment
obligation. This factual dispute need not be resolved. Lott learned about the overdue loan only when
he contacted the Comptroller to discuss Wolfe's severance benefits after the decision to terminate had
been made. Med-Tel does not contend that it would have terminated Wolfe on this ground alone.

13

2002, which was more than 300 days after (i) October 2000, when the "boys' club" era[17] ended; and (ii) December 2000, when Wolfe had the sexually-charged conversation with Coleman. These claims, therefore, are time barred.

Wolfe attempts to use the "continuing violation" theory to save her "boys' club" and Coleman sexual harassment claims. She argues that Greene's sexual harassment continued until her termination. Under the "continuing violation" theory, Wolfe's earlier sexual harassment claims would survive only if she suffered sexual harassment during the limitations period. National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 (2002).

Wolfe, however, has produced insufficient evidence that Greene's sexual harassment continued after October 2000, when Med-Tel reprimanded Greene and terminated Barnes. Wolfe's conclusory and unsupported allegation that Greene's misconduct persisted is contradicted by other statements in her affidavit and by her own deposition testimony. A party cannot create a genuine issue of fact by filing an affidavit that conflicts with prior deposition testimony. Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984).[18]

---

[17] Through their "boys' club" antics at the Salisbury facility, Greene and Barnes created a hostile work environment. See Von Gunten v. Maryland, 243 F.3d 858, 869-70 (4th Cir. 2001) (workplace harassment amounts to an "adverse employment action" when "there is evidence of conduct severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive"). Wolfe's claim regarding the harassment is not, however, viable in the absence of a timely EEOC charge.

[18] Wolfe does advance claims of employment discrimination that arose during the limitations period. Her allegations are properly characterized as claims of retaliation rather than claims of sexual harassment. Accordingly, the later allegations of discrimination cannot serve to save the earlier claims. See Seward v. Harford County, 2001 WL 283090, at *4 (D. Md. Mar. 13, 2001); Bolt v. Norfolk S. Corp., 22 F. Supp. 2d 512, 516 n.4 (E.D. Va. 1997).

14

For the foregoing reasons, the Court concludes that Wolfe's sexual harassment claims are time barred, and the Court will, by separate Order, GRANT Med-Tel's motion as to Count I.

### B.    Count II - Retaliation

#### 1.    Failure to Promote

Wolfe's failure-to-promote claim is also time barred. Med-Tel denied Wolfe's promotion request in January 2001, more than 300 days before Wolfe filed her EEOC charge on June 19, 2002.

Once again, Wolfe attempts to salvage her claim by raising the continuing violation theory. The law in the Fourth Circuit is clear, however, that the continuing violation theory does not apply to discrete acts of discrimination, such as the denial of a promotion.[19]

#### 2.    Hostile Work Environment

Wolfe next claims that Greene subjected her to a hostile work environment in retaliation for her complaints of sexual harassment. "To establish a prima facie retaliation claim, [a plaintiff] must produce evidence from which a reasonable jury could find (1) that he engaged in a protected activity; (2) that his employer took an adverse employment action against him; and (3) that a causal connection existed between the protected activity and the asserted adverse action." Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 188 (4th Cir. 2004).

Regarding the second prong, retaliatory harassment can constitute an adverse employment

---

[19] See Williams v. Giant Food Inc., 370 F.3d 423, 429 (4th Cir. 2004) ("Because failure to promote is a discrete act of discrimination, . . . the continuing violation doctrine does not apply here and cannot save [the plaintiff's] untimely claims." (citing Morgan, 536 U.S. at 114)); Janey v. N. Hess Sons, Inc., 268 F. Supp. 2d 616, 623 (D. Md. 2003) (citing the " well-established law which holds that the continuing violation doctrine does not apply to discrete discriminatory actions, such as promotions").

15

action if there is "evidence of conduct 'severe or pervasive enough' to create 'an environment that a

reasonable person would find hostile or abusive.'" Von Gunten v. Maryland, 243 F.3d 858, 869-70

(4th Cir. 2001) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). Accordingly, for her

claim of retaliatory harassment to be actionable, Wolfe must "show that her workplace was both

subjectively and objectively hostile." Von Gunten, 243 F.3d at 870.

  The Court does not doubt that Wolfe subjectively perceived her work environment to be

hostile. Wolfe, however, cannot establish that the workplace was objectively hostile. "To determine

whether the workplace was objectively hostile, a court must look at all the circumstances, including:

the frequency of the discriminatory conduct; its severity; whether it was physically threatening or

humiliating, or merely offensive; and the degree to which it unreasonably interfered with the employee's

work performance." Jeffers v. Thompson, 264 F. Supp. 2d 314, 330-31 (D. Md. 2003) (citing

Harris, 510 U.S. at 23). "The standard for proving a hostile work environment is intended to be very

high." Jeffers, 264 F. Supp. 2d at 331.

  Wolfe cannot meet this high standard. As discussed in the statement of facts, Greene's

harassment consisted of giving Wolfe the silent treatment. While this undoubtedly made Wolfe

unhappy, Title VII "does not remedy everything that makes an employee unhappy." Jeffers, 264 F.

Supp. 2d at 329. The evidence shows that Greene's petulant behavior did not impair the quality of

Wolfe's work or cut her off from the flow of necessary information. The terms and conditions of her

employment were unchanged, her co-workers did not isolate her, and Greene was soon replaced as

her supervisor by the more communicative Parker.

   **3. Termination**

16

Wolfe also claims that her termination was retaliatory. At the summary judgment stage, a retaliation claim must be analyzed under the familiar McDonnell Douglas burden-shifting framework.[20] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). The plaintiff must first establish, by a preponderance of the evidence, a prima facie case of retaliation. Beall v. Abbott Labs., 130 F.3d 614, 619 (4th Cir. 1997). Once the plaintiff has met this burden, the defendant must articulate a legitimate, nonretaliatory reason for the adverse employment action. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000). If the defendant offers such a reason, the plaintiff is "afforded the opportunity to prove by a preponderance of evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext" for retaliation. Id. at 143 (internal quotations omitted).

Wolfe has neither established a prima facie case of retaliation, nor shown that Med-Tel's stated reasons for the termination were pretextual. Accordingly, Med-Tel is entitled to summary judgment.

### a.    Wolfe Has Not Established a Prima Facie Case of Retaliation

Med-Tel concedes that Wolfe's complaints regarding Barnes and Greene were protected activity and that her termination was an adverse employment action. Med-Tel, however, challenges Wolfe's ability to satisfy the third prong, *i.e.*, that there is a causal connection between her complaints and her termination.

Wolfe complained of the boys' club sexual harassment 19 months prior to her termination, and

---

[20] For a discussion of the purposes behind the McDonnell Douglas framework, see Ennis v. National Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 59 (4th Cir. 1995).

she rebuffed Coleman's advances 17 months before her termination. A lengthy lapse of time between

the protected activity and the adverse employment action "negates any inference that a causal

connection exists between the two." Church v. Maryland, 180 F. Supp. 2d 708, 745 (D. Md. 2002)

(quoting Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir.

1998) and concluding that 14-month lapse was too long), aff'd, 2002 WL 31819679 (4th Cir. Dec.

17, 2002).[21]

Moreover, the decision to terminate Wolfe was made by headquarters personnel. Wolfe

offers no evidence that Coleman even knew about the termination until after the fact. With respect to

Greene, the record shows only that he was one of several people on the *ad hoc* committee that

decided to terminate Wolfe. In addition, the ultimate decision regarding the termination of

technologists lay with Dr. Platenberg, not Greene. (Def. Ex. 26, at 59; Def. Ex. 27, at 60.)

Accordingly, no fair-minded jury could find that Med-Tel retaliated against Wolfe by terminating her.

Even assuming *arguendo* that Wolfe could establish a prima facie case, her claim still fails

because she has not presented sufficient evidence to discredit Med-Tel's nonretaliatory reasons.

> **b.     Wolfe Has Failed to Present Sufficient Evidence on the Issue of Pretext**

Drawing all inferences in favor of Wolfe, the Court must assess the record to determine if it

---

[21] See also Causey v. Balog, 162 F.3d 795, 803 (4th Cir. 1998) (concluding that 13-month lapse is too long); Ali v. Mayor's Office of Employment Dev., 2004 WL 189786, at *4 (D. Md. 2004) (stating that span of 18 months "makes it impossible to impute the requisite causal connection between the two events"); Parkinson v. Anne Arundel Med. Ctr., Inc., 214 F. Supp. 2d 511, 518 (D. Md. 2002) ("The lapse of more than one year between the protected activity and the adverse action does not support an inference of causation."), aff'd, 2003 WL 22462655 (4th Cir. Oct. 31, 2003).

fairly suggests that the proffered reasons for the termination are false. Reeves, 530 U.S. at 147-49.

In its summary judgment motion, Med-Tel asserts the following two legitimate non-discriminatory reasons for Wolfe's termination: (i) her friction with her co-workers; and (ii) her continued abuse of Med-Tel's telephone system.[22]  The Court will address each in turn.

### i.    Friction with Co-Workers

Wolfe does not contest the following: (i) all three of the Salisbury technologists complained about Wolfe to Parker; their complaints were consistent, citing Wolfe's moodiness and unpleasantness; (ii) the technologists complained of Wolfe's behavior before the Lenderking incident, which served as the catalyst for Wolfe's termination; (iii) the Lenderking incident was itself a serious matter demonstrating stark hostility between the two co-workers; and (iv) following the incident, the three technologists documented their problems with Wolfe in writing.

The undisputed evidence shows that the friction between Wolfe and her co-workers was a serious problem, and Wolfe has presented no evidence whatsoever to demonstrate that Med-Tel either seized upon or manufactured co-worker dissatisfaction to mask a true retaliatory ground for

---

[22]  In its summary judgment motion, Med-Tel does not list Wolfe's alleged failure to repay the loan as one of its legitimate, non-discriminatory reasons. Even if it had, however, Wolfe cannot show that alleged failure to repay was a pretext for retaliation. First, Lott was specifically informed by Med-Tel's Comptroller that Wolfe "had not repaid the loan as guaranteed." (Def. Ex. 1, ¶ 17, n.2.)  There is no evidence that the Comptroller had any reason to lie to Lott or that Lott had any reason to doubt the Comptroller's statement. Second, Wolfe has failed to produce sufficient evidence that she was repaying the loan. Finally, even if Wolfe could show that she was not in default on the loan, the record reveals that the decision to terminate Wolfe had been made before Lott ever became aware of the outstanding loan. (Id., ¶ 17.)

termination.[23]

### ii.    Abuse of Telephone System

Wolfe admits that she had repeated and lengthy long-distance telephone conversations, on company time and using the company phone, with a paramour in Ohio, and that she had been previously warned to stop this behavior. Wolfe's only defense is that other employees were misusing the company phones as well.

There are two answers to this argument: (i) Wolfe was not terminated for telephone abuse alone; the evidence shows that this was an ancillary reason for her termination; and (ii) Wolfe makes no showing that the company regarded her telephone abuse as a trivial matter, as evidenced by the fact that she had been warned a year earlier to stop the behavior.

For the above reasons, the Court will, by separate Order, GRANT Med-Tel's motion as to Count II.

---

[23] Wolfe's claim of pretext is based on a tortured analysis that requires a brief explanation. Following her termination, Wolfe applied for unemployment benefits to the Maryland Office of Unemployment Insurance ("Unemployment Office"). In ruling that Wolfe was entitled to benefits, the Unemployment Office found in passing that she had been terminated "because of alleged threats by co-workers to quit if [she] remained employed." (Pl. Ex. 17.) Wolfe claims that this reason is incorrect because no co-worker ever threatened to quit.

This argument is a red herring. First, the Unemployment Office's fact-finding has no preclusive effect on this litigation either through collateral estoppel or *res judicata.* Second, there is no evidence that Med-Tel used that specific language in describing its reason to terminate Wolfe. Instead, the language appears to be an overstatement of a legitimate concern of the company. In her written statement, one of the technologists stated that she was worried that Wolfe's behavior might cause other technologists to quit. Moreover, Lott's affidavit shows that the company was, in fact, afraid that someone would quit because of Wolfe. While there may not have been a specific threat in this regard, there was a legitimate general concern.

20

## V.     Conclusion

For the foregoing reasons, the Court will, by separate Order, GRANT Defendant's Motion

for Summary Judgment and DIRECT the Clerk to CLOSE the case.

Dated this 31st day of March, 2005

_____/s/_____

Benson Everett Legg
Chief Judge

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| PATRICE WOLFE | : | |
| | : | |
| v. | : | CIVIL NO. L-02-3965 |
| | : | |
| MED-TEL INTERNATIONAL | : | |
| CORPORATION | : | |

## ORDER

Pending in this employment discrimination lawsuit is Defendant's Motion for Summary

Judgment. For the reasons stated in the Memorandum of even date, the Court GRANTS Defendant's

Motion and DIRECTS the Clerk to CLOSE the case.


It is so ORDERED this 31st day of March, 2005

                                        _____/s/_____
                                        Benson Everett Legg
                                        Chief Judge